Sacramento and Meredith Mining Company v. Showers.

SACRAMENTO AND MEREDITH MINING COMPANY, APPELLANT, *v.* JAMES SHOWERS *et als.*, RESPONDENTS.

NEW TRIALS NOT MATTERS OF DISCRETION. The granting or refusing a new trial is not a matter of mere discretion.

"TREATING THE JURY" CAUSE OF REVERSAL. Where, during the progress of a trial and before retiring to deliberate, and while under charge of an officer for the purpose of viewing the ground in controversy, the jury went into a saloon and drank liquor at the expense of the prevailing party: *Held*, that the verdict and judgment thereon should be set aside.

WHAT TAMPERING WITH JURY AVOIDS VERDICT. The rule, that a verdict in favor of a party who treats or entertains the jury will be set aside, applies to any treating of any of the jury at any time after they are sworn and before they agree upon their verdict, whether once or several times, by design or inadvertently, in the presence of the officer or in his absence, and whether it might be called for or uncalled for by the proprieties of life.

APPEAL from the District Court of the First Judicial District, Storey County.

The plaintiff, a corporation, organized under the laws of California, commenced this action in February, 1870, against James Showers, O. C. Steel, B. F. Kenny and Goodwin Jones, to recover possession of a portion of the "Hearst and Meredith Ledge," and the "Sacramento Ledge," at Virginia City, upon which they were alleged to have intruded; for damages in the sum of $600 on account of such intrusion, and for an injunction to prevent interference with the property. Defendants denied all the allegations of the complaint, and also set up ownership in themselves.

*Sunderland, Wood & Deal,* and *Williams & Bixler,* for Appellant.

The verdict should be set aside for irregularity of the proceedings of defendants, and for the misconduct of the juror, L. Sperling. (*Johnsen* v. *Root,* 2 Fish C. C. R. 291; *Henry* v. *Ricketts,* 1 Cranch C. C. R. 545; *Harrison* v. *Rowan,* 4 Wash. C. C. R. 32; *Thompson's Case,* 8 Grat. 660; 2 Sumner, 19; 1 Cush. 63; 2 McLean, 35; *Leighton* v. *Sargent,* 31 W. H. 11; For. 137; 7 Cowan, 562; 13 Conn. 445; *Purinton* v. *Humphreys,* 6 Green-

leaf; *Wilson* v. *Abrahams*, 1 Hill, 211; *Commonwealth* v. *Roby*, 12 Pick. 519.)

*R. S. Mesick* and *J. Seeley*, for Respondents.

Whatever may be thought of the decisions referred to by plaintiff as authority for reversing a judgment because the jury had partaken of liquor during the trial, none of them have any direct application to the present case. They refer to instances where the jury were permitted or induced in some manner to indulge in the liquor *after they had left the bar* and retired to their room to deliberate as to their verdict. It is necessary, under the authority of recent decisions, for the party claiming a reversal to show that the jury, by the use of liquor, had become incapable of proper deliberation, or that the civilities and attentions of the party to the action furnishing the refreshments were of such an unusual character, or were tendered under such circumstances, as to produce in the mind of the Court the belief that they had operated unjustly and prejudicially to the party against whom the verdict was rendered. (*Phillipsburg Bank* v. *Fulmer*, 2 Vroom [N. J.] 52; 27 United States Digest, 456, Sec. 13; *Commonwealth* v. *Roby*, 12 Pick. 519; *Richardson* v. *Jones and Denton*, 1 Nev. 405.)

By the Court, GARBER, J.:

Ejectment for a mining claim. The testimony was conflicting. Defendants having obtained a verdict, the plaintiff moved for a new trial, on the ground, among others, of misconduct of some of the jury and of the prevailing party. The motion was overruled, and from the order denying it and the judgment on the verdict, this appeal is taken.

The motion was supported by affidavits on behalf of the plaintiff, showing that during the time the action was on trial and before the jury retired to deliberate, the jurors, while under charge of an officer for the purpose of viewing the ground, went into a saloon and there drank liquors at the expense of the defendant Showers; that one of the jurors offered to pay for the drinks, but was not allowed to do so by Showers, who volunteered to pay for them; that during the noon recess on the last day of the trial, one Apple-

ton, who had previously been seen in company with Showers, went into a store where Sperling, one of the jurors, was employed; that he was followed into the store by one of the affiants, Handley; that when Handley entered the store, Sperling, who was alone in the front room, came toward the front portion of the store where Handley was, and at that time Handley saw Appleton writing at a desk in the back room; that soon afterward Appleton came out of the back room and Sperling turned and met him about the center of the front room, when Appleton held up a piece of paper before Sperling, who seemed to read it; that a brief conversation took place, and Appleton then left and passed down the street until he approached a building against which Showers was leaning; that as Appleton drew near, Showers left the place where he had been standing and met Appleton about the middle of the street; that they then started up the street, walking closely together and conversing, and were soon joined by Steele, another of the defendants, and the three passed up the street talking amongst themselves out of the hearing of others, Showers exhibiting signs of pleasure; that Handley was in the habit of making the store his place of spending his leisure hours, but had never before seen Appleton there.

The only counter affidavits are those of Showers and Appleton. Showers deposes that the jury entered the saloon after examining the ground, of their own motion; and after having entered it, the officer in charge asked them to drink; that some of the jurors took beer and some cigars; that none drank more than once, and then nothing strong, and none were affected by the liquor; that after drinking, and while the jurors were leaving the saloon, he, Showers, proposed to the officer to pay for the drinks and cigars, and thereupon did pay for some of them, a member of the jury paying for the residue; that he had no further or other connection with the matter set forth in plaintiffs' affidavits so far as the same relate to the drinking of the jury at said saloon.

Appleton deposes that he is acquainted with Sperling; that at no time during the trial, or while Sperling was acting as a juror in this cause, or between the impanneling of the jury and the rendition of the verdict, did he have any conversation with or hold any

communication with said Sperling, or any other, with reference to said cause, or in any way intermeddle therewith, or attempt to influence the verdict of the jury therein.

·Respondents contend that at common law, eating, drinking and the like, at the expense of the prevailing party, avoid the verdict only when occurring after the jury have left the bar and retired to their room to deliberate, and that the rule has been so far modified by modern cases as not to apply where the civilities and attentions paid to the jury are inadvertent, or such only as are called for by the ordinary proprieties of life; that they must be, to vitiate the verdict, of an unusual character, or so tendered as to induce the belief that they operated prejudicially to the losing party. As to the common law rule, we take the following extracts from books of recognized authority. " If the jury, after their evidence given unto them at the bar, at their own charges eat or drink, either before or after they be agreed upon the verdict, it is finable; but it shall not avoid the verdict; but if, before they be agreed on their verdict, they eat or drink at the charge of the plaintiff, if the verdict be given for him, it shall avoid the verdict; but if it be given for the defendant, it shall not avoid it, etc., and *sic e converso*. If the plaintiff, after evidence given and the jury departed from the bar, or any for him, do deliver any letter from the plaintiff to any of the jury concerning the matter in issue, or any evidence, or any escrow touching the matter in issue, which was not given in evidence, it shall avoid the verdict, if it be found for the plaintiff, etc." Coke, 227 (b), (e).

" If *any one* of the jury eat or drink without license of the Court, before they have given up their verdict, they are finable for it. *. * * If it be at the charge, for the purpose of the prisoner, and they find him not guilty, the verdict shall be set aside." Hale, 2 P. C. 306.

" If the jury eat and drink at the cost of a party, after they are gone from the bar, and before they are agreed, their verdict shall not be received, if the verdict be for the same party that gave the meat and drink, *for this induces affection*. But if they eat and drink at their own costs, by assent of their keepers, it being brought by the keepers, it shall not avoid the verdict." 21 Viner's Abr. 448.

"I take not the law of the realm to be that the jury, *after they be sworn*, may not eat or drink till they be *agreed* of the verdict; but truth it is, there is a maxim and an old custom in the law, that they shall not eat nor drink *after they be sworn*, till they have given their verdict, without the assent and license of the justices. And that is ordained for eschewing of divers inconveniences that might ensue thereupon, *and that specially* if they should eat or drink at the cost of the parties; and therefore, if they do the contrary, it may be laid in an arrest of the judgment." Doctor and Student, 271.

In 1 Graham & Waterman, 99, it is laid down: "That eating and drinking at the expense of the prevailing party has always been held to vitiate the verdict;" but in the cases cited, the eating and drinking occurred after the jury had retired to deliberate.

In Co. Litt. 156, (b) 157 (b), after defining a principal challenge as so called because, if it be found true, it standeth sufficient of itself, without leaving anything to the conscience or discretion of the triors, it is said: "If any after he be returned do eat and drink at the charge of either party, it is a principal cause of challenge." But, in *Morris* v. *Vivian*, 10 Meeson & Welsly, 137, at an adjournment for the night, after the jury were sworn, but before the summing up, two of the jury dined and slept at the house of the prevailing party. The counsel for the failing party, on moving for a new trial, stated that neither he nor his client believed that either of the jurors had been influenced in the slightest degree by the hospitality in question, and that he was instructed expressly to disclaim any such imputation. The motion was denied. The Court declined to lay down any rule for cases where suspicion of bias or unfairness could possibly attach; but treated the granting or refusing the motion as in the discretion of the Court, where there was confessedly no ground for such suspicion. They said there was no positive peremptory rule compelling them to set aside the verdict under such circumstances; that the English authorities above cited only show that where all that remains for a jury to do is to deliberate upon and give their verdict, if they eat and drink at their own expense, they may be fined; and if at the expense of the party for whom their verdict is given, it is void; and only apply

to the whole jury and to acts done by them, after they retire to deliberate.    They further say :  " It is quite clear that, in this case, they could not have been fined for eating and drinking at their own expense, and it is not seen that they fall within the other branch of the rule."

We cannot accede to this reasoning.    With us, the granting or refusing a new trial is not a matter of discretion.    It may be clear that in 1842, when *Morris* v. *Vivian* was decided, the jurors in that case could not have been fined for eating and drinking at their own expense during the adjournment ; but it by no means follows that their eating or drinking at the expense of the prevailing party was not fatal to the verdict.    At that period it was settled that where the length of the trial rendered it necessary, the cause might be adjourned, and the jury allowed to separate for the purpose of refreshment and repose ; and the assent of the judge to the eating at their own expense was implied by his allowing  them to separate for such purposes ; and Coke, in saying they might be fined, must be understood to speak of eating and drinking without such assent, for before his time it had been adjudged that they might lawfully eat and drink, at their own cost, by permission of the Court.

In 1819, in deciding that the jury may disperse at adjournments, this distinction was taken, the Court saying, that " if they separate without the consent or approbation of the judge, express or implied, it may be a misdemeanor in them and they may be punished."    (1 Chitty, 401.)    Even if, in 1842, the restriction against eating at their own cost  being  originally  preventive mainly of  delay, and from an early period dispensable at the will of  the Court, had become obsolete, this furnishes no argument against the existence of the part of the rule intended to guard against corruption, and which no Court was ever authorized to dispense with.

Again, the same reason which forbids treating all, forbids treating any—and Hale says, as we have seen, " If *any one* eat, etc."

Coke, it is true, speaks of several things as finable or fatal to the verdict, in the same connection, viz :  " after their evidence given," 'or " after their departure from the bar," etc.    But the passage obviously applies to some of these things when occurring at any period of the trial : for example, delivering letters, etc., to a jury, as to

which Hale says: " If the prevailing party or any in his behalf, say to a juryman *after his departure from the bar*, and before verdict given, the case is clear for the plaintiff; this will avoid the verdict if given for the plaintiff, for it is new evidence.   But not if *after the jury are sworn* he speaks with a juryman, but nothing touching the business at issue."   (2 P. C. 307.)   Showing that the expressions, " after their evidence given,"—" after their departure " and " after the jury are sworn," were used by these authors as conveying the same meaning.   So in the passage from Doctor and Student, written in the reign of Henry VIII:   " They shall not eat or drink after they be sworn, etc."

But even if Coke had more particularly in view acts done after the jury retired to deliberate, it is not pretended that he ever laid down any other or different rule as to acts occurring before that stage of the trial, and there remains the pointed and direct expression of the common law rule, cited from Hale and St. Germain.

That Coke should use language thus restricted does not seem remarkable, if we consider that issues were then generally determined at one sitting, the jurors always attended by bailiffs, and that perhaps no case had occurred of an adjournment before the close of the testimony.   As late as 1796, the Court having sat thirteen hours without any refreshments, Lord Kenyon adjourned till next morning, observing that necessity justified what it compelled, and that though it was left to modern times to bring forth cases of such extraordinary length, no rule could compel them to continue sitting longer than their natural powers would endure.   In citing this case in Graham & Waterman, it is said that it was originally thought a great and dangerous innovation to suffer the jury, upon a capital trial, to depart from the bar of the Court during a temporary adjournment, even though kept under care of sworn officers; and in Coke's time no distinction was made between civil and criminal cases in this regard.   (*State* v. *Miller, infra.*)   The jury was considered as *charged* with the cause as soon as empannelled and sworn.   (4 Taunton, 311.)   He may then have contented himself with laying down the rule in terms sufficiently broad to comprehend any case likely to arise.   But, the reason being the same, the law should be the same, and the object of the rule is to prevent

20

that which induces favor. Now what possible difference can it make whether the eating, etc., at the expense of the party take place after the jury are sworn and before they retire to deliberate, or while they are deliberating? Until the juror was accepted and sworn, either party might challenge him, and so might protect himself from the influence of all such civilities occurring theretofore. But after he was sworn, the only remedy was by granting a new trial, if the juror had been tampered with. The passage cited from Coke as to challenges is conclusive. Treating a juror after he is returned is made a principal cause for challenge—of itself, without more, disqualifies.

Clearly then, the time when the treating occurred was immaterial, if at any time after such return—after a small body of men has been selected from the community, and so rendered liable to this kind of solicitation and approach. The policy of the law was to prohibit this kind of treating at any time after such selection, and this policy was enforced by the right of challenge when the treating occurred before empannelment, and the right to a new trial where it occurred too late for a challenge to be availed of.

We think, then, that at common law all the rules designed to secure the purity of trial by jury applied from the moment the jury was sworn till the verdict was agreed upon. Very anciently, it is possible they could neither separate, eat or drink during that interval; but if the rule ever existed in such extreme severity, it was flexible, and carried within itself an implication of such exceptions as were necessary to its practical working. It was soon agreed that they might separate in case of pressing danger without the leave of the Court; (1 Cowen, 222, note) that they could eat and drink at their own cost, in the presence and with the assent of the Court, (20 Henry, 7, 3, 6) and in the same reign, "that if the thing wherein the jury misdemean themselves is by the act of the party who has the benefit of the verdict, there shall be a new trial, otherwise the jury only shall be fined", (15 Henry, 7, 1, 6): next, that the Court could adjourn if the trial could not be finished at one sitting, still keeping the jury in charge; and lastly, that during adjournments in civil cases and misdemeanors, the jury might be allowed to disperse.

But so much of the common law as was essential to its wise policy in this behalf, and consistent with the practical administration of justice under the changed conditions wrought by advancing civilization, remains in full force, and must so remain until abrogated by legislative enactment. That policy was to obtain twelve impartial and competent jurors, and after their selection to keep them so, by securing them as far as might be from the possibility of improper intercourse or undue influence.

Eating and drinking, if not at the charge of either party, and adjourning for refreshments and repose, are safely—as not even tending towards partiality or favor—and necessarily—as required by the length of modern trials—allowed. Dispersing at such adjournments has also been considered permissible on similar, but more questionable grounds ; the necessity only consisting of a great convenience, and the license being liable to abuse ; and consequently our statute has practically restored the common law in this respect. The very reasons resorted to, to sustain the innovation thus condemned by our statute, are pregnant with a strong argument against the propriety of that sanctioned in *Morris* v. *Vivian.* It was argued that although public as well as private interests would be promoted by now, as anciently, suffering no unattended departure from the bar, yet that issues now, instead of being determined at once, or in a few hours, take days and even weeks ; that as it is necessary to adjourn, it is also necessary for jurors to look after their private affairs, etc. : but to permit eating and drinking at the expense of the prevailing party is now, as it ever was, impolitic, unsafe and unnecessary. The weak and facile may be influenced by such attentions, and though it appears in a given case that none have been influenced, still the practice breeds suspicion and dislike of a mode of trial most admirable and useful if it attain and deserve the confidence and respect of the public—worse than useless if it fail of either such attainment or desert.

We think it is shown that whenever that is properly adjudged lawful which, according to the rigor of the ancient law, was unlawful, there have concurred, a real or supposed necessity a consequent power in the Court to license the act, and the express or implied consent of the Court to the doing of it. Neither of these es-

sentials can be predicated of the act here in question. It was, then, irregular and unlawful.

Being also "the act of the party who has the benefit of the verdict," and he himself having caused the irregularity, public policy requires that the verdict, however right, should be forfeited. (*State v. Miller, infra.; Com. v. Roby*, 11 Pick. 519.)

We find in the American cases nothing to shake our confidence in the correctness of this view, but rather confirmation of it. It is true, the precise point that the treating by the party before the jury retire to deliberate is fatal to the verdict, was actually *decided* in none of the following cases, except those from Georgia; but in all of them, except that from Iowa, the misconduct alleged took place at adjournments before the close of the testimony. In *State v. Muller*, 1 Dev. & Bat. 508, the Court say it is laid down anciently that a jury once charged cannot be discharged before they render a verdict, nor can they separate, eat and drink without license from the Court. This we find as a general proposition, without any qualification as to cases civil or criminal; or referring, except as to eating and drinking, to leave first granted by the Court. As regards the particular misconduct of eating or drinking, it has been settled ever since 14 Henry, 7, that unless it be at the charges of the party it avoids not the verdict. So Judge Bronson, 1 Hill, 207: "I cannot think it sufficient ground for setting aside the verdict, unless there be some reason to suppose that the juror drank to excess, or at the expense or on the invitation of one of the parties." In *State v. Perry*, Busbee, 333, the Court say that if the jury had been fed at the charge of the party, they should not hesitate to grant a new trial. In *Springer v. State*, 34 Georgia, 379, one of the attorneys kept a juror home over night free of charge. P. C.: We are thoroughly persuaded that the counsel was solely actuated by generosity, and we credit the affidavits of the jurors that they were uninfluenced. So it was in the Hunter Will case; yet the verdict in favor of his client was set aside, because the attorney allowed a juror to dine at his table whilst the cause was being tried. For the same reason, we must direct a new trial in this case. The honor of the bar and the perfect purity of a jury alike demand their entire separation in their personal and social intercourse

whilst trials are progressing.    However harmless in themselves was
the conduct of our respected brethren in these cases, we feel our-
selves called upon in this, and in every case where this separation
is not preserved with the utmost care, to evince our purpose to shut
up every avenue through which corruption or the influence of
friendship could possibly approach the jury box."

In *Ryan* v. *Harrow*, 27 Iowa, 500, the modern rule is thus
stated: "If a juror has communications in regard to the cause
with a party or an attorney therein; if he receives refreshments
from a party to the suit, or is exposed to other temptations that
might operate upon him to corrupt his verdict, the courts will not
enter into an inquiry whether indeed such was the result; but, in
the fear of possible improper influences wrought thereby, will set
aside the verdict.    Jurors of ordinary intelligence and firmness
would not be influenced by these things; but it is safer to remove
temptations entirely out of the reach of jurors, than by weighing
them to determine whether in fact the pure fountain of justice has
been corrupted.    In *Thompson's Case*, 8 Grattan, 657, it was laid
down that if refreshments, either eating or drinking, are furnished
by the prevailing party, it is sufficient ground for setting aside the
verdict; but it was decided that such treating by a witness for the
party, if done inadvertently, in the presence of the officer, his
credibility not being questioned, etc., is not sufficient ground.    In
the case of *Phillipsburg Bank* v. *Fulmer*, 31 N. J. 52, relied on by
respondent, the Court say: "Considering the great importance of
jealously guarding the jury against improper influences, and the
reason there is to fear that the practice of thus endeavoring to pro-
cure a favorable verdict is becoming more and more prevalent and
dangerous, enough suspicion has been thrown on the conduct of the
defendant and his sons to make it our duty to interfere.    It does
not distinctly appear that there were private conversations with
jurors on the subject of the cause; but it does appear that unusual
civilities and attentions were paid to several of them, and they
were treated more than once, and in such a manner as to render it
in the highest degree probable that it was not done inadvertently
and only so far as was called for by the ordinary proprieties of
life, but for the express purpose of influencing the verdict.    There

is no danger that we shall err in requiring of the parties the most scrupulous care to avoid even the appearance of adopting undue means of insuring success."

Of course all this case *decides* is, that such misconduct as was there shown will vitiate the verdict; but it seems to intimate that the mere fact of treating inadvertently, &c., is not fatal. The opinion intimated is evidently based upon what was said by Judge Hornblower in an earlier case, (*Tomlin* v. *Cox,* 4 Har. 79) where the following passage occurs: " Since jurors have been permitted to separate during the progress of trials, Courts have sedulously endeavored to protect them from the out-door interference of parties and their coadjutors, by setting aside verdicts in all cases where such attempts have been made, without stopping to inquire whether they had any influence on the verdict or not. I am willing it should be understood to be the determination of the Court to set aside every verdict in a doubtful or contested case, if it can be ascertained that the prevailing party, by himself, his retainers or agents, has held any private conversation with a juror, out of Court, on the subject of the cause while it was on trial. I am almost willing to go further, and say that a verdict ought to be set aside if it can be shown that the prevailing party has manifested to a juror any unusual civilities or attentions : such as treating or entertaining him at his expense, or having any other communications with him during the progress of the trial, save such as is called for by the ordinary proprieties of life between fellow citizens when they accidentally meet." Most likely Judge Hornblower simply meant that a verdict should be set aside for treating or entertaining a juror, and that it should also be set aside for any other communication uncalled for by the ordinary proprieties of life. But however this may be, we prefer to follow the plain, simple rule of the common law. The rule, it is said, was adopted " to prevent the jury from being *tempted* to find a verdict against their unbiased sense of the right of the case, by motives of gratitude or of feeling for favors, *however slight,* conferred by either of the parties," (4 Wash. C. C. 34) and therefore the rule applies to any treating, of any of the jury, at any time after they are sworn, and before they agree upon their verdict ; whether once or several

times; by design or inadvertently, in the presence of the officer or in his absence; and whether we might deem it called or uncalled for by the proprieties of life. And there is no hardship or undue severity in this rule. If the prevailing party is put to the expense and vexation of a second trial, he can blame no one but himself. It is simply enjoined upon him to refrain from intermeddling with the jury; to keep aloof from them during the progress of the trial, and to see that his attorneys and agents do the same. In this particular case, which of the proprieties of life would have been violated if the defendant had so conducted—had suffered those who ordered and drank the liquor to pay for it? If this was inadvertent, what treating should be considered designed? But we do not feel called upon to enter into these nice distinctions, involving questions which must be decided, if at all, each upon its own circumstances, without the aid of any known guiding principle of law. Probably, even in cases of treating by design, it would be long before another case would arise in which the designing party would not come prepared with some at least plausible excuse for his act, or to show that it was only inadvertent, or called for by the ordinary proprieties of life.

As, for the act of Showers in treating the jury, the order appealed from must be reversed, it is unnecessary to decide the other questions raised. We do not wish, however, to be understood as sanctioning the practice of moving for a new trial upon affidavits made on information and belief. Doubtless the Court, if requested, would have compelled Piper to testify; and we think that, in all cases where tampering with the jurors or the like is suggested, the Court should lend a willing ear to an application to compel the attendance and thorough examination of all parties cognizant of the facts, (8 Abb. Pr. R. 141; *Richie* v. *Holbrooke*, 7 Serg. & Rawle, 457). Whether the plaintiff's affidavits make out a *prima facie* case in regard to the conduct of Appleton and the privity of Showers thereto need not be decided. (*Vide*, however, 2 Graham & W. 295.) But if they do, we doubt the sufficiency of the counter affidavits to rebut it. The affidavit of Showers artistically excludes any conclusion of a denial of complicity with Appleton, and that of Appleton is altogether too vague and general. If there

was nothing wrong in his visit to the juror, and if Showers had nothing to do with it, as may be the facts, they could easily have given, in their affidavits, a full and satisfactory explanation. In cases where misconduct of this kind is charged, we think the counter affidavits should be full and explicit, and so state the particular facts and circumstances that if false, perjury could be assigned. It may be that so far as they relate to the alleged misconduct of Appleton, the counter affidavits were all that was called for by those of the plaintiff, but the alarming extent to which the practice of tampering with juries has been carried, may justify this intimation of our intention to apply the law in such cases with corresponding stringency. The judgment and order appealed from are reversed, and the cause remanded for a new trial.