NEVADA ROCK & SAND COMPANY, INC., A CORPORATION, APPELLANT, *v.* MIKE GRICH, RESPONDENT.

No. 3272

September 5, 1939. 93 P. (2d) 513.

*Morley Griswold* and *George L. Vargas*, for Appellant:

*H. R. Cooke*, for Respondent:

**OPINION**

By the Court, TABER, C. J.:

The parties will sometimes be referred to as plaintiff and defendant. In the court below appellant was defendant, and respondent plaintiff.

In December 1935 appellant entered into a contract with the State of Nevada for the grading and repairing of a section of public highway, approximately five miles in length, in the vicinity of Virginia City. At the time of the accident hereinafter mentioned appellant, pursuant to said contract, was working on said highway about one mile southerly from said city. On April 19, 1936, and for some time prior thereto, plaintiff, his partner and brother-in-law Frank Putzell, and George Krasevac, nephew of Putzell and an employee of the partners, were and had been working a mine situated near said highway, and about three miles southerly from said city. These men, for a considerable period of time prior to said 19th day of April, had been traveling back and forth between Virginia City and the mine several times practically every day. About five o'clock in the afternoon of said day they were returning from the mine to Virginia City in Krasevac's automobile, a 1929 Ford roadster, the car in which they regularly made their trips between Virginia City and the mine. When they reached a point a short distance from where the accident happened, they stopped the car because defendant's scarifier, with bulldozer in front driven by Kenneth Wood, was aproaching from the opposite direction. They remained there several minutes until Mr. Wood,

after approaching to within a short distance of them, turned his equipment onto a pioneer road just above the old highway, which defendant was grading, leveling, and widening. After proceeding about fifty feet on said pioneer road, Mr. Wood, who was then facing towards Virginia City, turned part way around in his seat, faced the three men sitting in said roadster and made a signal with his left arm and hand. Appellant claims that this signal was given to Mr. Whiting, another of its employees. Respondent, on the other hand, maintains that the signal was made to him and his companions. In any event, just after said signal was given, Krasevac, who was driving, started the car and proceeded some fifty feet or more, when the car left the road, and after moving down the steep hillside a short distance, overturned a number of times, resulting in serious personal injuries to plaintiff. When the Wood signal was given and when the accident occurred, Mr. Whiting, in charge of a caterpillar with Le Tourneau scraper attached, was north of Mr. Wood in the direction of Virginia City, while plaintiff and his companions were to the south of him.

Plaintiff alleged that his injuries were caused by defendant's negligence. This was denied by defendant, who also alleged that plaintiff was guilty of contributory negligence, and that his said negligence was the proximate cause of the injuries. A jury trial was had in department No. 2 of the Second judicial district court, Washoe County, resulting in a general verdict for the defendant. Plaintiff moved for a new trial, which was granted, and the present appeal is from the order granting plaintiff a new trial.

In rendering its decision granting plaintiff a new trial, the trial court said in part:

"The facts of this case are that on the day when this accident occurred the employees of the defendant in the action were working upon the road at the point where the accident occurred and were cutting down the hillside above the roadbed and were scraping the dirt and

rock that came from the cut above off from the highway onto the bank, widening the road. The evidence establishes, I think without any contradiction that the plaintiff, who was riding with the other two parties in the car that went over the grade, came to a point on the grade a short distance from where the accident occurred. That they then saw Mr. Wood, who was an employee of the defendant and who was in charge of the construction of that road, coming along toward them with a tractor, a bulldozer, and pushing the rock and dirt from the place where it had been deposited by cutting above, or rather, from the inner side to the outer side of the road.

"The evidence establishes, I think, that the parties in the car stopped and that Mr. Wood proceeded to a point near them and he turned from the roadway and went up on a road above that was used for the purpose of cutting the bank. And that when he got upon the bank he turned and faced the parties in the car and made a sign with his arm, waving it, which they construed to be a direction to proceed. I think Mr. Wood said that he did not make that to the parties in the car. But it was the same sign that he had used previously when he directed these same parties to proceed over the road while it was in the process of construction, and he admitted that he was facing the parties in the car when he made the sign, and he illustrated upon the stand the method in which he made the sign and that method which he indicated could not be construed as anything else but a direction to the parties in the car to proceed.

"The evidence, to the mind of the Court, establishes the fact that they proceeded with due caution, not at a rapid rate of speed, and that when they reached this point just before they stopped the car, the car slid over the grade, two of the parties jumping from the car, and the plaintiff in this action being carried down the hill by the car and injured.

"While there was considerable conflict of testimony in the case, it appears to the mind of the Court that in the

giving of that signal the employee charged with the duty of directing traffic over the road was guilty of negligence. And under all the authorities cited the Court is of the opinion that the parties driving the car had a right to act upon that signal. That it was in effect a declaration to them, 'Proceed, the road is safe,' and that there was nothing in the character of the road at that particular time to warn them of the situation, as they had been going over it for days."

Following said decision, a written order granting a new trial was filed, from which we quote the following: "Wherefore, and it appearing to the Court that there was a manifest disregard by the jury of the instructions of the Court and that the evidence is insufficient to justify the verdict and that said judgment and verdict is against law, * * *"

The main subjects of controversy are these: (1) The testimony of Kenneth Wood; (2) the condition of the highway at and near the point of the accident, and in particular, whether there was a soft shoulder at that point which gave way under the weight of the roadster; (3) whether the car in which plaintiff was riding stopped just before leaving the road, or was driven across and off the highway without stopping.

Kenneth Wood, who was in defendant's employ at the time of the accident but not at the time of the trial, was called as a witness by plaintiff, and the important part of his testimony was as follows:

"Q. What kind of signals did you give? Just indicate to the jury. A. I gave a signal to Mr. Whiting to come through.

"Q. What kind of a motion of your hand? Indicate to the jury, if you will, what kind of a motion of the hand you gave? A. Would be a circle (indicating).

"Q. Which hand did you use? A. That hand (indicating).

"Q. Which way were you facing when you gave that signal? A. I was facing on the side, like that (indicating).

"Q. With reference to where Putzell and Grich and the car was down on the old road bed, which way were you facing? A. I was facing toward them.

"Q. This man Whiting was over some distance to the northwest of that, wasn't he? A. To the north, yes.

"Q. He would be in the back, with the way that you were standing at the time you gave the signal? He would be behind you? A. Not back, no.

"Q. You were facing the Grich car? A. Yes.

"Q. Facing them sort of in this position and then you gave the signal about the way I am indicating?

"Mr. Griswold: Object to that as leading and suggestive with reference to that question.

"The Court: The objection is sustained.

"Mr. Cooke: (Q) Will you stand up in front of the jury and show them how you were standing, or what your position was at the time you gave the signal? A. I was sitting as I am now.

"Q. And you were facing the Grich car, you told us? A. With my face to them, yes.

"Q. And then you motioned with your left hand how? Would you show that again? A. Like this (indicating).

"Q. Could you see what they did immediately upon your making that motion? A. No I did not.

"Q. Whether they started up or not? A. No, not at the time.

"Q. How many motions of your hand did you give or make? A. Just one.

"Q. Just the one? A. Yes.

"Q. On previous occasions when Grich and his companions were going backward and forward over that road, do you recall whether or not you gave them any signals to stop or start? A. I would not say whether I have or not.

"Q. You would not say whether you had or not? A. No, I would not say."

Plaintiff, Putzell, Krasevac and a Mr. Stack all testified positively that the Wood signal was made to the three men in the roadster. Mr. Wood, as has been

seen, testified that he gave that signal to Mr. Whiting. Mr. Whiting did not give any testimony as to whom the Wood signal was given. The one signal was all that was given either by Wood or anyone else. It is not contended by defendant that any stop or warning signal was given to the three men in Krasevac's car. Witnesses Harker, Putzell, Krasevac and Grich testified that it had been customary for Wood to make stop and go signals to themselves and other persons.

With reference to the condition of the highway at and near the place of the accident, plaintiff's complaint alleges that "the old road bed of said road at said point became covered to a depth of about 2 feet with soft dirt, loose rock and crumbling gravel, placed thereon by defendant in its work of grading, leveling and widening the road bed preparatory to later completion of the grading thereof and by then hard-surfacing the new road bed." Answering the foregoing allegation, defendant in its amended answer "denies that at the time and place mentioned in the said complaint the old roadbed of said road became covered to a depth of about two feet with soft dirt, and/or loose rock, and/or crumbling gravel or to any depth in excess of a few inches."

Respondent relies chiefly upon the following testimony as showing the condition of the highway and of the shoulder along its outer edge:

Frank Putzell, who was riding on the inside (right-hand side) of the roadster, testifying in behalf of plaintiff, said in part: The dirt (on the roadway) was awful soft and yieldy; "we felt the soft dirt yielding"; the fill was made up of gravel and soil—a good deal of rock, fine gravel mixed in; "this soft shoulder kind of gave, as it did the car started sliding forward but didn't turn over immediately * * * this soft dirt started to yield * * * the dirt was soft material. * * * As we approached it there we felt the car gradually giving in the soft material * * * it is a porphyry formation so it would make it a soft material * * * the dirt kind of crumbled there * * * the shoulder did slide away

I don't know there approximately maybe 18 inches of it * * * it gradually slid away. * * * After the accident there was quite a depression there, about a foot but none before the accident. * * * The wheel sunk into the material, the tire cut into the material 8 inches or a foot * * * it was on the shoulder side of the roadway"; defendant's bulldozer would scrape off from the opposite bank and the material would go off outside of the road; the fill of loose material on the road was about 2 to 3 feet deep; he could feel that there was a lot of soft material there, figured around 2 feet; as they drove along they felt the wheels keep giving on the soft material; it was very hard to drive on; he knew they had a lot of loose fill there several times; the bulldozer would work some of the dirt over the edge of the roadway; there was a lot of soft material; they were traveling in low gear; the road was very soft; the wheels sank 3 or 4 inches into it; the fill was about half soil and half rock.

Kenneth Wood, hereinbefore mentioned, testified that his bulldozer gouged up material, ran it off the side of the bulldozer and dumped it over the side.

Ernest Harker testified in behalf of plaintiff that he passed over the road on the morning of the day of the accident; that defendant was operating scrapers and bulldozers; that it was all on loose fill; that "you would get stuck in the soft dirt"; that the fill was over the old roadway; that the fill was smoothed up so you could drive over it; that within the week next preceding the accident there were several times when the road was so bad that it couldn't be traveled at all; that he made a number of complaints to the highway department, as well as to Gus Olson, defendant's superintendent; that "it got there towards the end it was practically useless to make complaints unless you went down and saw Mr. Mills (assistant engineer of the highway department), and then they would fix it a day, and it would be back in the same fix again." (Mr. Harker was interested in

two mines, one of which was that in which plaintiff and Frank Putzell were interested and at which George Krasevac was employed. He rode back and forth between these mines and Virginia City in Krasevac's roadster.)

George Krasevac testified in behalf of plaintiff that he was the driver of the Ford roadster at the time of the accident; that there was a fill at the point where the car went off; that this fill was of freshly built dirt; that it was smoothed over; looked like it had been packed, but it was false; just a bunch of loose dirt and rocks; some of this loose material caved with him as he jumped out of the car onto it; that 2 or 3 feet of dirt gave way; there was a new fill; more of a fill in the evening of the day of the accident than when he went over the road in the morning; that defendant's employees cut out the bank and put it out on the shoulder; there was about 2 feet of shoulder; that this was all filled in by dirt muck; where the car went over, the shoulder sloughed and gave way; that the fill was 2 or 3 feet deep, as he judged; that the fill was 3 or 4 feet deep on April the 19th; that it was soil, clay, dirt and some rock; that there was no powder used on that part of the road; that about half of the fill where the car went off had been put in there some time during the day; that it wasn't necessary to dig holes to see the depth of the fill—one could see where the old road was exposed; that he saw defendant's employees building it up from time to time; he could not see the old road at the time the accident took place.

Mike Grich, plaintiff, who was sitting in the middle of the seat of the roadster between Krasevac and Putzell, testified that he was over the road in the morning of the day of the accident and had no trouble; in the evening when they returned, the road looked smooth till they came to the turn; that they didn't know the road was so soft; the surface looked all right; that the soft dirt caused the car wheels to give way; that when the car stopped, it was about 2 feet from the edge; that if

the bank had not given way the car would not have gone over it; that the car was 2 feet from the outer edge just before it went off; that Wood and defendant's crew leveled off the road and put dirt down the hill where the car turned; that the old roadbed (at this point) was all covered over when they came up in the evening; that it was covered with dirt and gravel; that the road was soft; the car pulled harder; he didn't take notice how deep the fill was.

Mark Amodei, witness for the defendant, and an employee of the state highway department at the time of the accident, testified that the shoulder (of the new road) was built out about 3½ to 4 feet at the time of the accident; the shoulder was built out not over a foot beyond the shoulder of the old road.

Gus Olson, defendant's superintendent at the time of the accident, testified in behalf of defendant that the fill was "4 to 6 or 7 inches maybe."

Roy Allen Bishop testified in behalf of plaintiff that he resided some fifteen years near the point where the accident occurred; that on the day of the accident he came up with a sick man and got out of the car about 100 feet east of the point where the accident occurred and walked on west towards Virginia City; that it looked too narrow to go by there (with a car).

W. J. Stack testified in behalf of plaintiff that he lived in Gold Hill 54 years; that in April 1936 he was prospecting the area several miles easterly of Gold Hill where the highway on which the accident happened was under construction; that the highway was in very bad shape; that on the day of the accident there was a fill, at the point where the car later went off, 2½ feet thick; that you could see what fill had been put in by seeing the old roadbed; that the material was soft; was over his shoe tops; was a kind of porphyry—decomposed porphyry; that defendant's employees were building up the old road grade; that there was about 2 feet of dirt on top of the old road; that he would judge that there

was 2 feet of material on the old road; at the time the car went over there was an appreciable amount of fill on that road; that there was more than a foot of fill.

Appellant, on the other hand, points out that at least five witnesses testified without qualification that the shoulder where the car left the highway did not give way. These witnesses were Mark Amodei, state highway engineer in charge of the construction work at and prior to the time of the accident; Gus Olson, superintendent for defendant corporation at said time; Herbert Whiting, employee of defendant at said time, but not at the time of the trial; Guy Isbell, independent competing contractor and member of Isbell Construction Company, who was near by at the time of the accident, and who testified that he was there that day for the purpose of investigating the operation of some of the defendant's special equipment work; and Joseph L. Moser, employee of defendant at the time of the trial, but not so employed at the time of the accident.

Appellant further points out that Frank Putzell, one of plaintiff's witnesses hereinbefore mentioned and one of the three men in the roadster, testified in part as follows:

"A. Well, I don't know whether any of the shoulder really slid off. None of the shoulder slid off.

"Mr. Griswold: (Q) Then what did slide off? A. Well, the side just gave in that soft material, yielding material, a certain depression there, a depression there. I don't think at no time any of this earth gave way."

Appellant further directs our attention to the fact that both plaintiff's and defendant's witnesses testified that Mr. Isbell, who was on the Virginia City side of the point where the accident occurred, *backed* his car some 300 feet along the highway and to within a short distance of the place where the car went off the road.

Appellant also refers to the uncontradicted testimony that Kenneth Wood with his equipment went over the place where the accident happened just a few minutes before it occurred.

Mr. Whiting, on cross-examination, testified in part as follows:

"Q. There wasn't anything about their car that particularly attracted your attention? A. Yes, sir, there was.

"Q. There was? A. Yes.

"Q. You were very much interested in that way? A. I was. Not to any great extent. I was interested due to the fact that it was customary for me to come down and clean the road for any traffic and I watched them particularly to see if they were getting through without my having to come down and clean the road for them, as I did previously.

"Q. You were a little apprehensive that the road might not be in condition for them to go through and that is why you took a particular interest? A. Yes, sir.

"Q. And you had customarily cleaned the road for them and for other cars, had you? A. Yes, sir.

"Q. What do you call cleaning the road, just what work was that? A. Well, it just meant a trip over the road, they had to go through with a scraper, dragging a scraper and picking up any loose material and leave them as much of a hard surface as it was possible.

"Q. That was under instructions, I take it, from your superiors? A. Yes, sir.

"Q. To keep the road open for traffic to the public? A. Yes, sir.

"Q. With comfort and safety? A. Yes, sir.

"Q. And besides doing the work of scraping down and moving dirt as you say, you also had this job of keeping a watch on cars and knowing that the road was all right; if it was not, then to scrape it so it would be all right? A. Yes, sir."

Putzell, Krasevac and plaintiff all testified that just a few seconds before the car left the highway, the driver had brought it to a stop; and it was further testified by one or more of them that as the car was brought to a stop the driver turned off the ignition. The reason assigned by these witnesses for stopping the car was

that just before doing so, they had observed that the road ahead was blocked and made impassable by large rocks. Plaintiff's complaint alleges that when the three men had started the car up after stopping the first time, they proceeded about 75 feet, "at which point they were able to see beyond the bend aforesaid and that the road was there impassable and closed by reason of an accumulation of large rocks and boulders left thereon by defendant in its said grading work, and plaintiff's automobile stopped. * * *" Defendant's answer "admits that the road at a point beyond the bend mentioned in said complaint was impassable and closed by reason of an accumulation of large rocks and boulders left thereon, and by reason of machinery working thereon." Defendant, in its said answer, denies that the roadster was brought to a stop just before going off the highway.

In behalf of defendant, Mr. Whiting testified in part as follows:

"Q. Now what happened then? A. Well, it just run up to the bank and the thing that impresses it on my mind is when the front wheel, the left front wheel left the grade, went over the grade. * * *

"Q. Did their car keep in the middle of the road or the outside of the road, or the inside of the road, from the point where you saw them start up to the point where they went off the grade, or could you tell? A. Drove from a point near the middle of the road to the outside in a quartering direction, as near as I saw.

"Q. They were when they started up about the middle, is that right? A. Somewhere approximately near the middle, yes.

"Q. And as they drove on and before they went off they got a little closer to the outer edge? A. Yes, sir.

"Q. Can you state as a fact, from your own knowledge, and what you saw, whether their car stopped just before it went off the grade? A. I can.

"Q. You can? A. Yes, sir.

"Q. Did it? A. It did not."

Mr. Isbell was not an eyewitness to the accident, but

was near by at the time and reached the scene of the accident a few minutes after it occurred. He testified in part as follows:

"Q. State what you saw in the way of tracks on the road? A. Do you wish me to state where—

"Q. Yes, right there where the accident occurred. A. Well, the tracks showed the track was going straight over the edge of the road, single track off the road. Just showed a single track off the road.

"Mr. Griswold: (Q) What do you mean by single track? A. Well, just showed where the car went straight off?"

Mr. Moser, one of defendant's employees at the time of the accident, was not an eye-witness to the accident itself, but the defendant's superintendent, within a very short time after the accident, sent him with a truck to the place where it occurred. Mr. Moser testified in part as follows:

"Q. At the place where this car went off the shoulder will you just tell the Court in your own words what you saw there at that place? A. I didn't see anything except small imprints on the edge of the bank like tires going over where the car left the bank.

"Q. Was there any caving or slipping away there? A. No, just two marks like ordinary tire marks. * * *

"Q. Now, adjacent to the place where that car went off that shoulder did you notice anything else up there on the bulldozer road? A. Nothing only just the tire marks on the fresh bulldozer road where they had been working.

"Q. Did you notice whether or not there were any tracks on the bulldozer road that lined in with the tracks that went off the shoulder? Do you recall anything about that? If so, tell the jury. A. The tracks there that myself and three or four other men looked at they didn't show from the shoulder of the bulldozer cut, but they showed on the shoulder of the road that was being built in a kind of a line at an angle to where the

tracks had gone over the bank, where the car catapulted there.

"Q. How much difference was there between those tracks on the bulldozer road and the tracks where they went over the shoulder? A. Oh, approximately thirty feet, I would say, maybe more; possibly forty, they were on an angle.

"Q. Will you tell the jury in your own language what the situation was there at the place where the bulldozer road and the old road came together? What is the situation as to how that was? A. Well, I would say like a road from any part would be, came along from a level and sloped up over this hump where the bulldozer was working up here.

"Q. Was there any jumpoff on the old road at that place at all, or was it a gradual— A. You mean from the top where the bulldozer was working?

"Q. No, what I am asking is this: the old road is going along this (indicating); the bulldozer could come in and tap it—A. Yes.

"Q. Where that took place what was the condition there? A. Just a slight slope up like any ordinary grade would be on any road?

"Q. No jumpoffs on it at all in the old road? A. No, I don't think so.

"Q. What was the situation as to whether there was a jumpoff up on the side and on the bulldozer road? A. Yes, there was a jumpoff there.

"Q. Will you state where the tracks were with reference to that particular point? A. I imagine about three or four feet up on the bulldozer road. * * *

"Q. And you followed those tracks down where they went across that dirt? A. Followed them across to what I call the road where the bulldozer was working and across the edge of the bulldozer road and across the edge of the old road and apparently lined together, and apparently, we thought, were made by the car that had catapulted over the bank, from the position of the car.

"Q. You say that they crossed the road at an angle, the traveled portion of the road? A. Yes.

"Q. At about what angle? A. Oh, I would say about a 45-degree angle.

"Q. So that it would appear that the fellow who made those tracks had driven almost straight across, not quite so, but at an angle as you have just stated? A. That is true. * * *

"Mr. Cooke: (Q) Can you indicate by the use of those cars, or in any way you want to, how those tracks appeared upon the ground out there when you said you saw those tracks on the evening of April 19th, 1936? Can you indicate upon the model about how they would appear with reference to the point you have already established here, the junction or the toe of the bulldozer road? A. B would be the toe or the junction of the bulldozer road. That was the point, when I came up to this, to the track, my track, the old road, the traffic, there were several machines behind me. The marks that we saw or that I looked at on what was known as the bulldozer road was directly in front of my track, my truck, what is known as the front end was standing approximately I think here (indicating). The tracks laid at an angle as though to lead into the old road, but could not be traced into the old road, and the next one, as I remember, were here and were traced on the bank at an angle approximately like this (indicating).

"Q. Set the little car down there and use it to indicate the angle at the point— A. I would say at an angle of about like that (indicating).

"Q. That is what you mean when you say about 45 degree? A. Yes. The tires or tracks that we saw or that we looked at led into the old road, and then in line were just the two marks on the bank where we saw where the car apparently had catapulted there.

"Q. But you could not trace these tracks from the point here or the toe on down to X? A. Not definitely. We traced them in the fresh soil of what is known as the bulldozer road.

"Q. Were they distinct so that you could be absolutely sure that those tracks you saw there were made by the same machine as went there (indicating). A. No."

Mr. Whiting testified that immediately after the accident, Mr. Putzell, who was on the side of the hill and who had not as yet been taken back to Virginia City, said in the presence of Mr. Wood, Mr. Krasevac and himself, "I told that g— d— fool not to drive off that bank." (Putzell denies that he made any such statement.)

Appellant contends that the foregoing testimony, coupled with the physical facts, proves that Krasevac lost control of the car and drove off from the pioneer road and over the bank.

The testimony in this case consists of nearly eight hundred pages. We have endeavored to epitomize those portions of it upon which the respective parties rely in support of their positions on this appeal.

We now turn to a consideration of the rules which should guide us in determining whether an order of the trial court granting a new trial should be affirmed or reversed, particularly when the order is based on insufficiency of the evidence to justify the verdict. These rules have received the consideration of this court in the following cases: Lawrence v. Burnham, 4 Nev. 361, 97 Am. Dec. 540; Scott v. Haines, 4 Nev. 426; State of Nevada v. Yellow Jacket S. M. Co., 5 Nev. 415; Sacramento & Meredith Mining Co. v. Showers, 6 Nev. 291; Phillpotts v. Blasdel, 8 Nev. 61; Worthing v. Cutts, 8 Nev. 118; Treadway v. Wilder, 9 Nev. 67; Margaroli v. Milligan, 11 Nev. 96; Solen v. Virginia & T. R. Co., 13 Nev. 106; McLeod v. Lee, 14 Nev. 398; Albion Mining Co. v. Richmond M. Co., 19 Nev. 225, 8 P. 480; Edwards v. Carson Water Co., 21 Nev. 469, 34 P. 381; Reno Mill Co. v. Westerfield, 26 Nev. 332, 67 P. 961, 69 P. 899; Golden v. Murphy, 27 Nev. 379, 75 P. 625, 76 P. 29; McCafferty v. Flinn, 32 Nev. 269, 107 P. 225; Goldfield Mohawk M. Co. v. Frances-Mohawk M. & L. Co., 33 Nev. 491, 112 P. 42; Goldfield Mohawk Min. Co.

v. Frances-Mohawk M. & L. Co., 35 Nev. 423, 129 P. 315.

From these decisions it will be seen that this court will reverse such an order of the district court: when the verdict is in accordance with the evidence, and there is no conflict in the evidence upon any material issue nor any substantial error shown to have been committed on the trial; when it clearly appears that plaintiff failed to make a case against defendants, that the evidence entitled defendants to judgment, and it is not claimed that any error or irregularity occurred at the trial; when there is a conclusive preponderance of evidence in favor of the verdict; when the weight of evidence clearly preponderates against the ruling of the trial court; or when the trial court has abused its discretion in granting the new trial.

On the other hand, this court will not disturb such an order of the trial court: when there is a conflict in the evidence upon some material issue, or substantial error shown to have been committed on the trial; when, though the evidence appears to this court to fully support the verdict, there is not a conslusive preponderance of evidence in favor of the verdict, or other cogent reason for reversing the order granting a new trial; where there is a material conflict in the evidence, and the positive evidence of the plaintiff sustains his claim; when the weight of evidence does not clearly preponderate against the trial court's ruling; where the evidence is conflicting, and the trial court is not shown to have abused its discretion in granting a new trial; where the trial court is of the opinion that the evidence adduced at the trial, taken in connection with newly discovered evidence, is insufficient to support the judgment, and a review of the evidence discloses that there is a substantial conflict in the evidence; or when, though there is evidence sufficient to support the verdict under the well-established rule applicable in case the motion for a new trial has been denied, this court cannot say that the trial court, in granting a new trial, manifestly abused the discretion reposed in it by the statute.

In State of Nevada v. Yellow Jacket Silver Mining Co., 5 Nev. 415, this court said: "The weight of evidence against the verdict need not be so decided and great to authorize the nisi prius Judge to set aside a verdict as is required by the Appellate Courts." So, in Treadway v. Wilder, 9 Nev. 67: "It must be borne in mind that the nisi prius courts in reviewing the verdict of juries are not subject to the rules that govern appellate courts. They may weigh the evidence, and if they think injustice has been done grant a new trial where appellate courts should not or could not interfere."

In Phillpotts v. Blasdel, 8 Nev. 61, the court says that in favor of the order granting a new trial, "we must assume every fact which the district judge finds a clear preponderance of evidence for and which we cannot find a clear preponderance against." ·

The Nevada cases are in line with the generally accepted rules obtaining throughout the United States. 5 C. J. S., Appeal and Error, sec. 1673, pages 792–796; 3 Am. Jur. 455, 456; 4 C. J. 904, 905.

 Appellant directs our attention to the rule that a verdict cannot be set aside by a trial court where no irregularity or error whatever is shown, and the verdict or decision is in accordance with and justified by the evidence. Scott v. Haines, 4 Nev. 426. Also to the rule that whenever a question of contributory negligence arises upon a state of facts in regard to which reasonable men might differ, it ought to be submitted to the jury. Solen v. Virginia & T. R. Co., 13 Nev. 106. We are in accord with these rules, and we also approve the rule that district courts ought always to use great caution in the exercise of the power to set aside verdicts of juries on the ground of insufficiency of the evidence to justify such verdicts. Solen v. V. & T. R. Co., supra; Albion Mining Co. v. Richmond M. Co., 19 Nev. 225, 8 P. 480. But no authority has been cited holding that the verdicts of juries are final, and the rules above stated do not conflict with the rule that trial courts should set aside verdicts where in their opinion there is

a clear preponderance of evidence against them; where the scale of evidence which leans against the verdict very strongly preponderates; where they are clearly satisfied in their judgment that the evidence is insufficient to sustain the verdicts; or where, after weighing the evidence, they think injustice has been done. State of Nevada v. Yellow Jacket Mining Co., supra; Phillpots v. Blasdel, supra; Treadway v. Wilder, supra; Goldfield Mohawk Mining Co. v. Frances-Mohawk Mining and Leasing Co., supra. Nor are the rules stated in the first part of this paragraph in conflict with those hereinbefore laid down regarding the province of appellate courts on appeal from orders of trial courts granting new trials on the ground of insufficiency of evidence to justify the verdicts.

The rule that the trial court may not merely substitute its opinion or judgment for that of the jury has no application where that court is satisfied that an injustice has been done and that the evidence clearly preponderates against the verdict.

Appellant contends that the trial court granted a new trial for the sole reason that the signal given by Wood constituted negligence on the part of defendant. Appellant complains that the trial court failed to determine the other issues, and in particular that the court did not pass on the question of contributory negligence. Appellant refers us to that sentence in section 3 of the 1937 new trials and appeals act (Stats. of Nevada 1937, chap. 32, p. 54) which reads: "The court or judge granting or refusing a new trial may state, in writing, generally, the grounds upon which the same is granted or refused." It is argued that although this provision may not make it mandatory that the trial court state the grounds for granting or refusing a new trial, yet if that court does state the grounds upon which its opinion is based, they are all-embracing and the order must stand or fall upon those particular grounds. Citing 46 C. J. 438, sec. 513, n. 14.

In rendering its decision granting a new trial

the lower court said, inter alia, that under the terms of defendant's contract with the state, defendant agreed that it would keep the road open for public traffic; that the signal given by Mr. Wood, which he illustrated upon the stand, could not be construed as anything else but a direction to the parties in the car to proceed; that the evidence, to the mind of the court, established the fact that the parties in the car proceeded with due caution, not at a rapid rate of speed, "and that when they reached this point just before they stopped the car, the car slid over the grade"; that in giving the signal Wood, who was charged with the duty of directing traffic over the road, was guilty of negligence; that the parties driving the car had a right to act upon that signal; "that it was in effect a declaration to them, 'Proceed, the road is safe', and that there was nothing in the character of the road at that particular time to warn them of the situation, as they had been going over it for days"; that "while the court is reluctant to set his judgment up against the judgment of the twelve men who were called as jurors, under the decision of the State of Nevada when a motion is made upon the ground that the verdict is not sustained by the evidence it becomes the duty of the Court if he is not satisfied with the verdict and believes the verdict is contrary to the evidence, to grant a new trial." From the foregoing it is clear that the ground upon which the new trial was granted was insufficiency of the evidence to justify the verdict, and that Wood's signal was not the only reason for the trial court's order. The causes for which a verdict may be vacated and a new trial granted are set forth in the statute, and one of them is "Insufficiency of the evidence to justify a verdict or other decision, or that it is against law." The signal given by Wood was not a statutory "cause" for granting the new trial; it was merely one of the facts which satisfied the trial court that the evidence was insufficient to justify the verdict. That the court did not overlook the question of contributory negligence is indicated by the statement

that "they proceeded with due caution, not at a rapid rate of speed, and that when they reached this point just before they stopped the car, the car slid over the grade." We do not understand the law to be that when a trial court, in granting a new trial upon the ground of insufficiency of the evidence to justify the verdict, states certain reasons for making its order upon that ground, this court is limited to a consideration of such reasons only. 5 C. J. S., Appeal and Error, sec. 1464, pages 88–92. This court, in reviewing the order granting a new trial, is not confined to the reasons given by the trial court in rendering its decision granting such order. Schnittger v. Rose, 139 Cal. 656, 73 P. 449. Nor is this court bound by such assigned reasons of the lower court. Tweedale et al. v. Barnett, 172 Cal. 271, 156 P. 483.

 While the opinion of the trial court on granting a new trial may be examined (Schnittger v. Rose, supra), it is the order, not the opinion, from which the appeal is taken. Clohan v. Kelso, 42 Cal. App. 67, 183 P. 349. One of the grounds for granting the motion in the instant case was that the evidence was insufficient to sustain the verdict. If the motion was properly granted on this ground, it is immaterial whether the trial court was in error in granting the new trial on other grounds. 5 C. J. S., Appeal and Error, sec. 1464, pages 88–91.

 To appellant's contention that the testimony of plaintiff's own witnesses shows that he was guilty of contributory negligence, it is a sufficient answer that in this case there was a sharp conflict of evidence on every controlling factual issue, so the question of contributory negligence was, in the first instance, a question for the jury. As was said by the supreme court of Oklahoma in Shreve v. Cornell, 182 Okl. 193, 77 P. (2d) 1, 3: "In setting aside the verdict for insufficiency of the evidence, the trial court does not commit an error of law unless there is a total failure of evidence to support the cause or defense of the party in whose favor the new trial is granted. A. & A. Taxicab Co. v. McCain [179 Okl. 492,

66 P.(2d) 17], supra. Here the evidence was conflicting. Therefore, the court's ruling thereon, that the same was insufficient, involved no question of law."

But appellant maintains that the evidence taken altogether shows so clearly that plaintiff was in fact guilty of contributory negligence, that it was an abuse of discretion for the trial court to set aside the verdict. In support of this contention appellant points to the testimony of plaintiff's own witnesses tending to show the very bad condition of the road, one of said witnesses testifying it was so bad that pedestrians would walk on the side of the hill rather than on the road. Appellant claims further that the car was not stopped just before it left the highway, but that the driver lost control and drove it over the embankment—this fact being corroborated by Mr. Whiting's testimony that Mr. Putzell, just after the accident, said that he told that fool Krasevac not to drive off that bank; that Wood with his bulldozer and scarifier had just gone over the part of the road where the accident took place, so that plaintiff and his companions had a road twelve feet wide to travel over, making it wholly unnecessary for them to travel so near its outer edge; that plaintiff had equal knowledge with defendant of all the facts and conditions obtaining at the time of the accident; and that the testimony of Mr. Wood that he made his signal to Mr. Whiting, not to the three men in the car, is binding upon plaintiff, as Mr. Wood was plaintiff's witness.

As against appellant's contention that plaintiff was clearly guilty of contributory negligence, respondent points out that the condition of the road, like all roads under construction, changed not only from day to day but at times even from hour to hour; that one trip alone with the bulldozer could easily transform a safe roadway into an unsafe one; that the passing of the bulldozer blade over the rough uneven surface smoothed it down so that it *looked* solid and safe; that any knowledge plaintiff had as to road conditions before the bulldozer leveled and smoothed off the surface would be

immaterial; that while the road near the outer edge appeared safe, it was unsafe in fact, with nothing to warn plaintiff of the unsafe condition; that Krasevac and his companions would not have driven over this part of the road if they had known of the soft shoulder, or if Wood had not given them the signal; that Mr. Whiting, one of defendant's witnesses, testified that running such equipment as that of Mr. Wood over the road would leave "fairly smooth surface for the cars to travel on"; that plaintiff and his companions had been traveling over this new highway several times a day for some two months, and would naturally expect the road to be safe, unless they received a stop or warning signal; that plaintiff and his companions were traveling near the outer edge of the road because the inner portion of it was impassable; and that Putzell did not make any such statement about telling Krasevac not to drive off the road as that attributed to him by Mr. Whiting.

While it is true that defendant offered substantial evidence tending to show that plaintiff was guilty of contributory negligence, it is also true that plaintiff offered substantial evidence tending to show that he was not guilty of such negligence; and after a careful review of all the evidence we find ourselves unable to say, under the rules laid down in previous decisions of this court, that by a clear preponderance of the evidence plaintiff was guilty of contributory negligence, and that such negligence was clearly the, or a, proximate cause of plaintiff's injuries.

With reference to appellant's contention that plaintiff is bound by the testimony of Mr. Wood to the effect that his signal was made to Mr. Whiting and not to the three men in the roadster: Respondent takes the position that Wood was an employee of defendant at the time of the accident and that his actual hostility as a witness to plaintiff is made manifest by his testimony, particularly where, in answer to the question, "What *kind* of signals did you give?" he replied, "I gave a signal to *Mr. Whiting* to come through." (The italics are

the court's.) If, however, it be conceded that plaintiff is bound by the testimony of Mr. Wood that he made his signal to Mr. Whiting, it does not by any means follow that all other evidence regarding this particular question must be disregarded. Plaintiff was entitled to show by other independent competent testimony that the signal was made to the three men in the car. 70 C. J. 795, n. 50; 70 C. J. 1156, sec. 1341. The trial court, in passing on the motion to grant a new trial, had the right to consider the positive testimony of the other witnesses that the signal was made to the three men in the car; the relative positions of Mr. Wood, Mr. Whiting and said three men; the fact that the roadster, after stopping the first time, did not start up again until Mr. Wood's signal was given; and the fact that no stop or warning signal was given.

Appellant maintains that it would be physically impossible for the accident to have happened as was testified to by plaintiff and his witnesses. But this was a disputed question of fact regarding which there was a substantial conflict in the evidence, and this court, after a consideration of all the evidence concerning this particular question, is not prepared to say it clearly preponderates in showing that the accident could not have happened as testified to by plaintiff and his witnesses.

Finally, appellant strongly urges upon this court that there is no showing in the evidence that defendant could or should have anticipated the accident as the natural and probable consequence of Wood's signal. No one, of course, would contend that if defendant's negligence was the proximate cause of plaintiff's injuries, such negligence was intentional; but if Mr. Wood's signal was made to the men in the car, or was given in such manner as would naturally lead them to believe that it was a signal for them to proceed, then, in the absence of a stop or warning signal, it would seem clear that it was incumbent on the defendant to know that the road was in such condition as to make it safe for plaintiff to travel over it.

As we are unable to say that the trial court abused its discretion in vacating the verdict and granting a new trial, the order appealed from must be, and is hereby, affirmed.