SYLVESTER JACKSON AZBILL, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 6122

April 7, 1972                    495 P.2d 1064

[Rehearing denied May 19, 1972]

*John Manzonie, Wiener, Goldwater & Galatz,* of Las Vegas, for Appellant.

*Robert List,* Attorney General; *Roy A. Woofter,* District Attorney, and *Charles L. Garner* and *Raymond D. Jeffers,* Deputy District Attorneys, Clark County, for Respondent.

## OPINION

By the Court, BATJER, J.:

A jury found the appellant guilty of murder in the first degree and set his penalty at life in prison without possibility of parole. The same jury found him guilty of arson in the first degree and he was sentenced to 10 years, both sentences to run concurrently. A motion for a new trial was denied, and this appeal follows.

The appellant and Rose Mapel were married on September 20, 1967. At the time of the marriage she was approximately 20 years his senior. On the evening of December 27, 1967, the charred remains of Rose Mapel Azbill were discovered in the master bedroom of the Mapel-Azbill home at 709 Rancho Drive, Las Vegas, Nevada. The appellant and his son, Brad Azbill, were the only persons immediately present when the disastrous fire started. At the trial Brad testified that sometime during the evening of December 27, 1967, between eight and nine o'clock, he was in the master bedroom of the Mapel-Azbill home with his stepmother, Rose Mapel Azbill, and the appellant. The appellant asked Brad to get him a drink. When Brad returned to the bedroom the appellant stated he was going to kill Rose because she had found out that he had married her for her money and was going to divorce him, and he then requested Brad to get some charcoal lighter fluid. At that time, according to Brad's testimony, the appellant hit Rose several times with his fist and then hit her with his crutch. Upon being hit with the crutch Rose raised herself on the bed and mumbled something. By then the appellant had poured the lighter fluid on the bed. Brad looked away to avoid seeing his father hit Rose, and he suddenly realized that the room was filling with smoke.

On the day of the fire, Mark Hutton and Frank Luhman, friends of Brad, visited him at the home of his father and stepmother. They arrived between 10 a.m. and 11 a.m. John Hutton, another friend, arrived about 6 p.m. At approximately 6:30 p.m. the appellant and Brad went to the liquor store where the appellant purchased beer and liquor. At about 7 p.m. Brad took a bottle of beer to the decedent and noticed

that the bottle of vodka on the floor near the bed contained less than three inches of liquor. At that time Brad observed that the decedent seemed alert and she thanked him for the beer. Just after 7 p.m. Brad went back out to the guest house behind the main house to be with his friends. At about 7:30 p.m. Brad was summoned into the house and told by the appellant that Rose wanted another can of beer. After serving the beer, as requested, Brad returned to the guest house where he remained until he was recalled to the main house by the appellant, just before the fire was started. John Hutton testified that as soon as the television program "Lost in Space" was over he looked toward the main house and saw smoke coming from it. He and the other two boys ran inside the main house where they met Brad, who told them the oven was on fire. They searched the kitchen area and failed to find any fire or smoke, then the appellant told them that the Christmas tree was on fire, but that the fire had been extinguished. After examining the tree the boys found no damage so they began looking around the house and found the smoke was coming from the master bedroom. The smoke prohibited them from entering the room so they went outside, broke the bedroom window and used a garden hose in an attempt to extinguish the fire. It was at this time that they saw the decedent in the flames. They then began yelling for someone to call the fire department and police. There was no cross-examination of John Hutton.

Frank Luhman testified that during the afternoon of the day in question, the appellant was quite drunk and boastful; further, that in such drunken state, the appellant threw a pen knife at him and then he brought a revolver into the living room and stated he would just as soon kill someone as look at him. The witness further testified that he saw Rose Mapel Azbill on the afternoon prior to her death while he was changing the sheets in the appellant's bedroom and that she appeared to be asleep in her room. At 5:30 in the evening, the appellant requested this witness to get some "girls," in return for such favor he was to be given $100. The witness, in response to the appellant's request, took a taxi but was unable to locate the type of women requested by the appellant.

Upon his return from the unfruitful search, the witness returned to the guest house. At about 8:30 p.m. he saw smoke coming from the main house and went to locate the fire. He corroborated the testimony of John Hutton that they were directed to the oven, and finding no fire there, were told by the appellant that the Christmas tree had been on fire. Having determined that the tree was not damaged he discovered the

fire in the bedroom, broke the window into the room, and upon observing a burning body he fainted. Upon cross-examination of this witness, the defense elicited testimony that on the day of the fire Brad was quite intoxicated and that he seemed to be almost falling down from drunkenness. On re-cross-examination the witness was asked why he had not previously told the police or grand jury about the incident with the gun or about going out in the early evening looking for "girls." He replied: "Nobody asked me."

In an attempt to impeach the testimony of the witness, the defense called Joanne Allison, a teacher at the school attended by the witness. She testified that he had a bad reputation for truth and veracity.

Mark Hutton corroborated the testimony about the pen knife and about the appellant's statement that the Christmas tree had been on fire. He also testified that he had not been drinking liquor that day but that Brad had been drinking but was not drunk. He added that while Brad and the appellant were at the liquor store in the early evening Rose had called for Brad.

The appellant took the stand and simply stated he did not start the fire. There was no cross-examination.

The appellant contends that the trial court erred (1) in denying him the right to impeach the respondent's witness by restricting cross-examination; (2) in giving an "Allen Charge" type of instruction to the jury which coerced them into reaching a verdict; (3) when it commented upon the testimony of an expert witness; (4) when it admitted into evidence colored photographs of the deceased; (5) when it allowed the respondent to impeach its own expert witness, and (6) in refusing to give an instruction which he had requested to the jury. The appellant further contends that the verdict of the jury is not supported by substantial evidence sufficient to justify such finding, and is contrary to the law and the weight of the evidence and that the aggregate of the trial court's error violates federal requirements of due process and constitutes grounds for a new trial.

1. The appellant, during cross-examination of Brad Azbill, Mark Hutton and Frank Luhman, sought to elicit testimony from them that they were involved, on or about May 6, 1968, in taking an automobile belonging to Halliburton Oil Well Cementing Company, without permission or authority, from Las Vegas, Nevada to West Covina, California; that they were arrested by West Covina authorities; that they were subsequently turned over to the juvenile authorities of Los Angeles

County and later returned to Las Vegas; and that no further action was taken. The appellant contended that he could properly inquire into the alleged offense for the purpose of showing interest, bias and state of mind of the witnesses.

The trial court by an order approving the respondent's motion *in limine* restricted the inquiry as to the alleged offense, but expressly stated that the appellant was not precluded from inquiry into the state of mind of each witness.[1] At various intervals during the trial the appellant made offers of proof as to the unlawful conduct of Brad Azbill, Frank Luhman and Mark Hutton. Each time the trial court made the same ruling for the reasons stated.

The scope and extent of cross-examination is largely within the sound discretion of the trial court and in the absence of abuse of discretion a reversal will not be granted. Smith v. Illinois, 390 U.S. 129 (1968); Beasley v. State, 81 Nev. 431, 404 P.2d 911 (1965); State v. Fitch, 65 Nev. 668, 200 P.2d 991 (1948); State v. McNeil, 53 Nev. 428, 4 P.2d 889 (1931).

NRS 48.020 provides: "No person shall be disqualified as a witness in any action or proceeding on account of his opinions on matters or religious belief, or by reason of his conviction of a felony, but such conviction may be shown for the purpose of affecting his credibility. . . ."

Although this court has indicated that within the limits of the exercise of sound discretion a cross-examiner must be permitted to elicit any facts which show bias, interest or similar

---

[1]"The Court: All right. The Court's ruling will be this Mr. Wiener (Counsel for the appellant): You may not inquire into any juvenile offenses or alleged juvenile offenses that he may have committed. You may ask him the question: 'Have any promises or anything been extended to him in return for his testimony in court,' and seek to lay a grounds for impeachment on that basis, but in the specific of things, juvenile offenses which he may or may not have committed, you may not examine him with regard to those. His state of mind, if you ask him, was he given anything or promised anything in exchange for his testimony at the time of the preliminary hearing, then you are going to develop his state of mind.

"The only thing that I'm going to permit you to go into, if you want to try and develop his state of mind, fine; but you may not examine him with regard to the factual content of any alleged juvenile offense which he may or may not have committed. If you want to develop in some way what his state of mind was, if he felt anything was being done for him at the time he testified at the preliminary hearing, fine; go ahead and do it, but I'm not going to let you examine him, factually speaking, with regard to his juvenile offense."

feelings which may color the witnesses testimony (State v. Fitch, supra), it is the established law in this state that the credibility of a witness may be attacked by showing his conviction of a felony but not by his mere arrest. Johnson v. State, 82 Nev. 338, 418 P.2d 495 (1966). However, the appellant cites Alford v. United States, 282 U.S. 687 (1931), for the proposition that upon cross-examination, for the purpose of establishing interest, bias or motive to testify falsely, some inquiry of the witness concerning his unlawful conduct may be permitted although there has been no felony conviction. Relying upon that case he claims that his constitutional rights were violated by the trial court's order *in limine* which precluded him from showing the interest, bias and state of mind of the juvenile witnesses. He contends that he should have been allowed to show not only the facts surrounding the taking of the automobile but also the fact that up to the time of his trial the juveniles had not even been charged with an act of delinquency.

The appellant's contention is without merit. The trial judge specifically afforded him the opportunity to inquire into any expectation of leniency. However, the appellant insisted upon an "all or nothing at all" position and he made no attempt to lay a foundation for any questions or to explore the perimeters of the order *in limine* and refused to further pursue cross-examination of the juvenile witnesses. Johnson v. State, supra.

2. During its charge to the jury the trial court instructed them as follows: "The Court instructs the Jury that although the verdict to which each Juror agrees must, of course, be his own conclusion, and not a mere acquiescence in the conclusion of his fellows, yet, in order to bring twelve minds to a unanimous result the jurors should examine with candor the questions submitted to them, with due regard and deference to the opinions of each other. A dissenting juror should consider whether the doubt in his mind is a reasonable one, when it makes no impression on the minds of so many jurors equally honest, equally intelligent with him, who have heard the same evidence, with an equal desire to arrive at the truth, under the sanction of the same oath. You are not to give up a conscientious conclusion after you have reached such a conclusion finally, but it is your duty to confer with your fellow jurors carefully and earnestly and with a desire to do absolute justice both to the State and to the defendant."

The appellant took specific exception to this instruction upon

the ground that it was an "Allen Charge" which has been condemned in a number of jurisdictions.

The name is derived from the case of Allen v. United States, 164 U.S. 492 (1896), in which the High Court approved a similar charge.[2]

In State v. Hall, 54 Nev. 213, 13 P.2d 624 (1932), this court held that an instruction very similar in wording to the "Allen Charge" was within the discretion of the trial court to give if it thought proper to do so. In Basurto v. State, 86 Nev. 567, 570, 472 P.2d 339 (1970), we considered an instruction identical to the one given here and we said: "The charge is approved so long as it makes clear to the jury that each member has a duty to conscientiously adhere to his own honest opinion and the charge avoids creating the impression that there is anything improper, questionable or contrary to good conscience for a jury to create a mistrial. . . . In this case the charge was clear that no juror was to give up any conscientious conviction he may hold. The coercive language and effect of State v. Hall [supra], is absent and this is desirable. While the choice of State v. Hall, supra, as against this new look is not now squarely presented our preference is expressed in this opinion. The 'dynamite' charge should be avoided."

A careful comparison of the instruction given in this case and in *Basurto* with the original "Allen Charge" indicates that those instructions are far less coercive than the original "Allen Charge" and they do make it clear to the jury that each member has a duty to adhere to his own honest opinion and they avoid creating the impression that there is anything improper, questionable or contrary to good conscience for a jury to create a mistrial. We find no error in the giving of instruction 52 in this case, however, as we did in *Basurto,* we again insist that the "dynamite or Allen Charge" should be avoided and that

---

[2]The charge in *Allen* was substantially as follows: "[A]lthough the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."

there should be an abandonment of all judicial interference in jury deliberations. Posey v. United States, 416 F.2d 545 (5th Cir. 1969); United States v. Fioravanti, 412 F.2d 407 (3rd Cir. 1969).

3. During the course of the trial the presiding judge used the phrase "your best guess"[3] in questioning an expert witness. The appellant asserts that the use of the word "guess" amounted to a prejudicial comment by the trial judge on the testimony.

A trial judge has the right to examine witnesses for the purpose of establishing the truth or clarifying testimony, but in doing so he must not become an advocate for either party, nor conduct himself in such a manner as to give the jury an impression of his feelings. Hernandez v. State, 87 Nev. 553, 490 P.2d 1245 (1971); People v. Rigney, 359 P.2d 23 (Cal. 1961); People v. Smith, 165 N.E.2d 333 (Ill. 1960); Baldwin v. District of Columbia, 183 A.2d 566 (D.C.Mun.Ct.App. 1962). Furthermore, under the guise of examining a witness, a trial judge must not comment on the evidence or attempt to mislead the jury or belittle or cast aspersions on a witness. Hernandez v. State, supra; Ginnis v. Mapes Hotel Corp., 86 Nev. 408, 470 P.2d 135 (1970); Kinna v. State, 84 Nev. 642, 447 P.2d 32 (1968); People v. Rigney, supra; Peterson v. Silver Peak, 37 Nev. 117, 140 P. 519 (1914).

We have reviewed the record in this case and are lead to the conclusion that the questioning by the trial court was for the sole purpose of eliciting the truth and to make more understandable the conclusions of the expert witness. It cannot be said that the employment of the phrase "your best guess" in the context of the examination was a comment on the evidence, nor an expression of the trial judge's feelings. Nor can it be said

---

[3]Judge Alvin Wartman, the trial judge, entered into the following question and answer colloquy with the witness, Dr. John Wesley Grayson, Jr.:

"Q. And your opinion as to the most probable cause of death is not that it was traumatic but that it was due to a combination of alcohol and barbiturates?

"A. I think that is the most probable. . . .

"THE COURT: . . . Do you mean to a medical certainty?

"A. . . . I don't really understand precisely the phrase 'medical certainty.'

"THE COURT: Well, in other words, are you saying this is your best guess on the basis of what we have at the present time.

"A. Precisely."

that the question was calculated to mislead the jury or belittle the witness.

4. Relative to proof that carbon monoxide was induced into the blood stream through the lungs of the victim at the time of the fire, certain colored photographs were admitted into evidence to show the color of the victim's blood. The appellant claims that the pictures were without a scientific purpose, that their presence only inflamed the minds of the jurors and that the trial court erred when they were admitted. We do not agree. Because the inhalation of carbon monoxide can affect the color of blood, a color photograph showing the color of the blood of the deceased was highly probative of whether or not she inhaled carbon monoxide during the fire.

The purpose of a trial is to ascertain and disclose the truth and any evidence which is relevant to that purpose is admissible. Here the color photographs were properly admitted because their probative value outweighed any prejudicial effect they might have had on the jury. Shuff v. State, 86 Nev. 736, 476 P.2d 22 (1970); Walker v. State, 85 Nev. 337, 455 P.2d 34 (1969); Langley v. State, 84 Nev. 295, 439 P.2d 986 (1968); Morford v. State, 80 Nev. 438, 395 P.2d 861 (1964).

5. Dr. John Wesley Grayson, Jr., and Dr. Thorne Jefferson Butler, witnesses for the state, both testified that the more probable cause of death of Rose Mapel Azbill was the use of a combination of ethanol and barbiturates. Dr. Joseph Alexander Jachimczyk, also a witness for the state, testified that her death was caused by the fire. The appellant objected to Dr. Jachimczyk's testimony upon the ground that its purpose was to impeach the testimony of Dr. Grayson and Dr. Butler. The trial court correctly found that the testimony of Dr. Jachimczyk was contradictory in nature and not for the purpose of impeachment and overruled the objection. In overruling the appellant's objection the trial court limited Dr. Jachimczyk's testimony to his opinions based on the independent research and observations and precluded him from in any way voicing an opinion on the testimony of Dr. Grayson and Dr. Butler.

Impeachment is an attack upon the credibility of a witness and usually may not be done by the party calling the witness, but he has a right to offer evidence showing facts to be different from those testified to by such witness and in that manner contradict his own witness. United States v. Williamson, 424 F.2d 353 (5th Cir. 1970); Commonwealth v. Staino, 204

A.2d 664 (Pa. 1964); State v. Winters, 344 P.2d 526 (Wash. 1959); State v. Timm, 12 N.W.2d 670 (Wis. 1944); Cahow v. Michelas, 62 Nev. 295, 149 P.2d 233 (1944); Nevada R. & S. Co. v. Grich, 59 Nev. 345, 93 P.2d 513 (1939); Wigmore, Evidence 3d ed., Vol. 3A 694–698 (1970); 98 C.J.S. Witnesses § 630.

In Talley v. Richart, 185 S.W.2d 23, 26 (Mo. 1945), that court said: "It is well settled a party may contradict his own witness by independent evidence showing facts to be different from those testified to by such witness. . . . Such rule does not violate the general rule that one may not impeach his own witness because to contradict is not to impeach. The terms are not synonymous. Impeachment is directed to the credibility of the witness for the purpose of discrediting him. It ordinarily furnishes no factual evidence. Contradiction, on the other hand, is directed to the accuracy of testimony and supplies additional factual evidence to be considered along with such testimony. Such evidence as is relevant to the issues may not be excluded because it contradicts another witness called by the same party, whether such witness is friendly or hostile."

In the present case the state did not seek to prove by Dr. Jachimczyk that either Dr. Grayson or Dr. Butler had at some previous time made contrary statements, but only to produce independent evidence that Rose Mapel Azbill's death had been caused by the fire. This the state was permitted to do and the trial court committed no error in permitting Dr. Jachimczyk to testify.

6. The appellant offered the following jury instruction which was rejected by the trial court: "In order to find the defendant guilty of homicide there must be an expert medical opinion worthy of belief and proving beyond a reasonable doubt fire was the cause of death."

The trial court properly rejected the offered instruction. After examining all of the instructions given by the trial court, and in particular instruction No. 19,[4] it is our opinion that the subject matter was properly and fully treated in the other instructions. It is the established law of this state that a trial court does not commit error when it refuses to give an offered

---

[4]Instruction number 19: "You may not speculate that a criminal agency caused the death of Rose Azbill. Death by a criminal means must be proven by evidence, proving beyond a reasonable doubt that said death was by a criminal means."

instruction if the content of that instruction is covered in other instructions, even though the offered instruction correctly states the law. Summers v. State, 86 Nev. 210, 467 P.2d 98 (1970); Wallace v. State, 84 Nev. 603, 447 P.2d 30 (1968); Carlson v. State, 84 Nev. 534, 445 P.2d 157 (1968).

The appellant contends that the jury verdict is not supported by substantial evidence and is contrary to the law and the weight of the evidence. If there is substantial evidence to support a jury verdict neither the trial court nor this court will disturb it. McGuire v. State, 86 Nev. 262, 468 P.2d 12 (1970); Lamb v. Holsten, 85 Nev. 566, 459 P.2d 771 (1969); Tellis v. State, 85 Nev. 679, 462 P.2d 526 (1969); Criswell v. State, 84 Nev. 459, 443 P.2d 552 (1968); Crowe v. State, 84 Nev. 358, 441 P.2d 90 (1968).

We find that although there was conflicting evidence, and in particular concerning the cause of death, there was substantial evidence to support the verdict in this case. The testimony of Brad Azbill and friends, as well as the testimony of the expert who found human tissue on the crutch, together with the testimony of the doctor who concluded that Rose Azbill died in the fire, is such substantial evidence.

Where questions of fact are dependent upon the credibility of witnesses, the jury is entitled to decide questions of credibility and the weight to be attached to their testimony. Martinez v. State, 77 Nev. 184, 360 P.2d 836 (1961).

In all criminal proceedings the weight and sufficiency of the evidence are questions for the jury, and its verdict will not be disturbed upon appeal if there is evidence to support it. The evidence cannot be weighed by this court. Nev. Const. art. 6, § 4; NRS 177.025; State v. Butner, 66 Nev. 127, 206 P.2d 253 (1949); State v. Soares, 53 Nev. 235, 296 P. 1081 (1931); State v. Watts, 52 Nev. 453, 290 P. 732 (1930); State v. Boyle, 49 Nev. 386, 248 P. 48 (1926); State v. Van Winkle, 6 Nev. 340 (1871).

7. As his final assignment of error the appellant claims that the trial court erred when it denied his motion, as an indigent, for an order directing Clark County to reimburse his attorney for costs advanced in his defense.

On May 9, 1968, the appellant filed a motion requesting that Clark County pay the expenses for a medical expert to make studies in the case on his behalf, based on his affidavit that he was indigent. This motion was granted on May 19, 1969. On October 7, 1969, the trial court ordered Clark County to reimburse the appellant's counsel for monies advanced to Dr. Henry, a defense pathologist. But when appellant moved for an order directing Clark County to reimburse his attorneys for costs advanced, the motion was denied.

In State v. District Court, 85 Nev. 241, 245, 453 P.2d 421 (1969), this court stated: "Holding, as we do, that an indigent defendant's constitutional rights require reimbursement to his counsel for out-of-pocket expenses incidental to his defense, the trial courts have the inherent right to entertain motions seeking such allowances and to order payment of such reasonable amounts as they, in their discretion, deem proper and necessary."

Here the trial court did entertain motions of the appellant for reimbursement of his counsel and on May 19, 1969, it found the appellant to be an indigent and allowed expenses for a medical expert. At that time appellant's status as an indigent was confirmed and all out-of-pocket expenses incidental to his defense incurred after that date by his counsel are reimbursable.

We affirm the jury's verdict and the judgment of the trial court, but remand the matter to the district court for the sole purpose of determining the reimbursable out-of-pocket expenses incurred by the appellant's attorneys from and after May 19, 1969, to and including September 25, 1969.

ZENOFF, C. J., and MOWBRAY, THOMPSON, and GUNDER-SON, JJ., concur.