C. W. FICK, APPELLANT, v. VERN R. PARMAN, RALPH PARMAN AND GEORGE SCHADLER, RESPONDENTS.

No. 3846

June 3, 1955.                    284 P.2d 380.

(Rehearing denied July 8, 1955.)

*E. P. Carville,* of Reno, for Appellant.

*Ernest S. Brown,* of Reno, for Respondents.

## OPINION

By the Court, MERRILL, C. J.:

This is an appeal from judgment in the sum of $2,827.-20, damage suffered by respondents through appellant's having wrongfully and maliciously driven from respondents' range 120 head of their cattle. Appellant contends that in three respects the findings of the trial court, sitting without a jury, are without support of evidence: (1) In that respondents have failed to prove that the cattle in question were driven from their range by appellant; (2) In that there is no proof of malice; (3) In that the damages allowed are excessive. Our concern, then, is not with propositions of law but with the sufficiency of the record to support the factual determinations of the trial court. The following are the established facts.

Summit Lake Indian Reservation is located in northwest Humboldt County. The surrounding area is predominately unsurveyed public domain. It is cattle country, range land under the grazing supervision of the Bureau of Land Management. The reservation is high ground. To the south the terrain drops off sharply

into a valley in which are located the home ranches of the parties to the action. About twelve miles south of the reservation in Soldier Meadows is the Fick ranch. Twenty miles farther south is the Parman property.

By directive of the grazing service the Fick summer range has been confined to the area south of the reservation. The Parmans have been allotted summer range to the east, north and west of the reservation. For some years Fick has disputed this range division, asserting rights to the eastern portion of the Parman range. In this he has not succeeded. In 1951, having driven cattle into this area contrary to the order of the range manager and having failed, after notice, to move them out, he was threatened with trespass proceedings. In October, 1952 (one month before the incidents upon which this action was based) he had again been ordered by the range manager to remove cattle from the Parman range. In 1953 trespass proceedings actually were brought against him. He did, however, possess drift rights into the area in question. In 1951 he was successful in requiring the Parmans to remove a fence which they had erected to prevent his cattle from drifting into the area. As a result of their many disputes the parties were not on the best of terms by 1952.

Adjoining the northeast corner of the reservation is a buckaroo camp known as Stanley Camp, owned in fee by the Parmans and used by them as summer range headquarters. South of Stanley Camp and also adjoining the reservation on the east is a natural pocket or basin, approximately three miles in length, known locally as Snow Creek Basin. It has for years been used by the Parmans as a natural holding ground in connection with their fall roundup. To the north and west it is protected by the reservation fence; to the east and south by high ridges of rimrock through which, although possible, it is unlikely that cattle would stray.

Around the first of November, 1952, the Parmans, from Stanley Camp, commenced a roundup of cattle throughout their range surrounding the reservation. In

this they were joined by representatives of other ranches (including the Fick ranch) whose cattle might have drifted into the area. The roundup was substantially completed by November 10. In accordance with a practice followed for many years the herd, held at Stanley Camp, was separated according to ownership and classification. Cattle belonging to other ranches were then put on the trail to those ranches. Certain of the Parman cattle were placed in fields leased within the reservation. The balance of the Parman herd was thrown into Snow Creek Basin from which it was later to be trailed to winter range, one portion northwest to California; one portion south to the desert below the Parman home ranch.

At the time the herd was placed in the basin it was found that about 100 head of Fick cattle already were there. Whether they had drifted there or had been driven there, contrary to orders of the range manager, is not settled by the record. One of the Parmans, however, expressed disbelief that this number of cattle could have strayed into the basin through the rimrock; especially since he had found evidence of salt placed there apparently for their use.

On November 12 or 13 Fick with one buckaroo set out from Soldier Meadows for the purpose of bringing his cattle back from the basin. It commenced to snow. By the time he had reached the basin over four inches had fallen and it was still snowing. He made no attempt to cut out his cattle from the herd. Instead, all of the cattle found within the basin were herded through a gate in the reservation fence, thence through the reservation and were then turned loose to drift south of the reservation. A few days later, according to his testimony, Fick conducted his own roundup of the area south of the reservation. Over 400 head of cattle so rounded up were gathered at Soldier Meadows. No other ranches were represented in this operation.

On November 20, one of the Parmans passing through Soldier Meadows found 120 head of their cattle held

there in Fick's fields. Two days later they were by the Parmans trailed back to the home ranch.

Upon Fick's first contention two essential questions remain: First: How many head of Parman cattle were driven from Snow Creek Basin? Fick and his buckaroo were the only eye witnesses to this operation. Their testimony was that no more than 100 head had been driven out of the basin, of which at least 75 were Fick cattle. However the fact that they were the only eye witnesses does not compel acceptance of their testimony. Other testimony gives rise to the inference that between 100 and 200 head of Parman cattle had been taken. Fick himself testified that in the herding operation he had moved all cattle found in the basin. A sheepherder camped nearby had observed the gather in the basin and estimated it at about 200 head. One of the Parmans estimated that about 200 head from the roundup had been placed there in addition to the Fick herd already there. The Fick representative at the roundup fixed this number at about 100 head.

In support of their position upon this question, the Parmans assert that in no other way than from the basin could 120 head of their cattle have wound up at Soldier Meadows. Fick states that they came there as a result of his own roundup. It does not necessarily follow, he contends, that all the Parman cattle south of the reservation came from the basin. They may have drifted in from outlying range. From the testimony as to the manner in which the Parman roundup had already covered this range and as to the normal extent of drift, the trial court may well have felt it unlikely that this number of Parman cattle could have drifted south of the reservation at the time of the Fick roundup. Certainly the record does not compel acceptance of Fick's theory. There is support, then, for the court's determination, notwithstanding Fick's testimony, that 120 head of Parman cattle had been driven from the basin.

Second: Did Fick act wrongfully? He contends that,

considering the storm, his action in fact amounted to rescue. The testimony of Parman witnesses, however, was to the effect that this particular storm was not severe; that fenced cattle could well have survived it; that the cattle in the reservation fields in fact did survive it undamaged and were not moved out until November 29; that the same was true of bands of sheep grazing in the neighborhood of or within the reservation; that weather conditions during that winter were normal and would not have compelled the Parmans to move their herd to lower ground until around the first of the year.

The record, then, does not compel a determination that Fick was legally justified in acting as he did with the Parman herd. Considering the dubious nature of his right to be in the basin at all, the trial court may well have concluded that Fick, in driving out the Parman cattle along with his own, had compounded what might be termed a stockman's trespass *quare clausum fregit* with a far more serious stockman's trespass *de bonis asportatis*.

Fick's second contention is that there is no proof of malice. Of the total amount of judgment, $250 was allowed by the trial court as punitive damages.

Again Fick points to the storm. Even though this may have given him no right to move the unsegregated herd still, he contends, it demonstrates that his motive was free from malice. From the written opinion filed by the trial court it is clear that it disbelieved Fick upon this point. The court obviously had in mind the continuing disputes between the parties, the order of removal by the range manager the previous month and the ill will which the record indicates still existed between them at the time of trial. Even at the time of trial Fick disputed the range division and asserted rights to use of Snow Creek Basin. In response to the Parmans' protests regarding the incident under consideration he had stated, according to one of the Parmans, "If you don't want me to mess up your cattle, just keep them out of my place."

Further the trial court's opinion specifically makes reference to one other incident disclosed by the record. On November 13 the Parmans were summoned to a grazing meeting in Winnemucca called upon a complaint made by Fick. The meeting did not materialize due to Fick's failure to appear. Apparently the court inferred that the Parmans had deliberately been induced away from the arena of action. Upon the record as a whole we are unable to state that the trial court's inference of malice was improper and without sufficient foundation.

Finally Fick contends that the record demonstrates that the damages allowed were excessive. The complaint sought $5,000 compensatory and $5,000 punitive damages. The testimony of the Parmans, if accepted at face value, made proof of close to $6,000 loss. Fick offered no evidence to offset this proof. He contends, however, that the Parmans' evidence itself demonstrates that no attempt whatsoever had been made to mitigate damages; that on the contrary the Parmans appear needlessly and recklessly to have taken the most expensive possible course of relief.

However, the Parmans' proof of loss was substantially discounted by the trial court itself in allowing judgment for roughly half of the damage sought. The court did not attempt to itemize the $2,577.20 compensatory damage allowed but did expressly recognize seven distinct items of loss. These included transportation of the cattle destined for California which otherwise could have been trailed from high ground; additional labor; winter feed required due to the fact that the condition of the cattle, after several days of insufficient graze south of the reservation, would not permit them to be placed upon desert range for the winter. The record unquestionably supports these items.

Judgment affirmed with costs.

BADT and EATHER, JJ., concur.