PHYLLIS HELEN JEZOWSKI, Appellant, *v.* CITY OF RENO, NEVADA, a Municipal Corporation, Respondent.

No. 3844

July 18, 1955.                                    286 P.2d 257.

(Rehearing denied August 26, 1955.)

*Martin J. Scanlan,* of Reno, and *Harry Russell Thayer,* of Carson City, for Appellant.

*Samuel B. Francovich* and *Bruce D. Roberts,* of Reno, for Respondent.

## OPINION

By the Court, BADT, J.:

Mrs. Jezowski sued the City of Reno for damages for operating its municipal dump ground as a nuisance, and further sought a judgment abating it. A jury found the dumping ground not to be a nuisance and plaintiff has appealed from the judgment entered thereon and from the court's refusal to vacate it. The sole question presented to us is whether the verdict of no nuisance finds any substantial support in the evidence. In other words, does the record compel a determination that a nuisance existed by reason of the manner in which the city was operating its dump and that the trial court thus committed error in refusing to vacate the judgment.

Mrs. Jezowski, then Mrs. Fields, in 1952 recovered a judgment for $1,000 under a similar cause of action. The same relative position of the dump on the one hand and plaintiff's residence on the other hand then existed. The city maintained its dump in a canyon some distance north of the city limits and had operated it for a great number of years before 1946 when plaintiff acquired her residence property about a mile to the northeast. For many years prior to 1952 the city used the burning method of disposing of waste material. During this period but little control was exercised over the dumping area. The waste material was dumped into a ravine and

burned without much effort to confine it to any particular area. Individuals dumping their own refuse would, for the most part, dump it where most convenient to them and such material was not covered. As a matter of fact when the city attempted to exercise control by denying access to the area during various hours, individuals would dump their refuse along the road leading to the dump ground or at the closed gates or anywhere in the neighborhood they saw fit. Fire and smoke continuously poured from the dump ground, and papers and trash were blown about by the winds. Between the time the plaintiff recovered her first judgment and the time of the conditions of which she complains in her second action, various changes occurred. The former city manager, who had been employed as such from 1947 to 1953, had made a study of the dump situation. Disposition by means of an incinerator was considered. This method was discarded for three reasons. The estimated cost would have run to between six hundred thousand dollars and one million dollars. The use of such method would have virtually eliminated private dumping—and private dumping in an accessible dump was considered a prime factor in preserving a clean city. Thirdly, an incinerator would still have created fire, smoke and odor and would not entirely solve the problem. Next a study was made of what is known as the land-fill method which was checked by the city's engineering department. It was found that various cities of comparable and greater size pursued this method with good results. The engineering department further checked to see if the dumping area was suitable for a land-fill operation. Nature and depth of soil were investigated, and found to be satisfactory for a period estimated at between five and ten years. The establishment of this method was postponed until further funds were available in an increased budget and by increasing the city's charge against the inhabitants of the city for trash removal. In the meantime various other sites were investigated one by one and rejected. Conferences were

had with various other city engineers and the land-fill method was found to be widely used. Continuous studies were made through the publications of the city managers' association. The method installed was the establishment of a caretaker continuously in charge who told people exactly where to dump. This followed a general cleaning up of the area.

The present city manager described the method now used. The waste materials are dumped in the area reserved at the time for dumping. A bulldozer pushes the material over the embankment or into the lower section that is being filled. This is then compacted by the dozer and a dirt cover is placed over it. A different section in a deep ravine is used for bulky materials such as car bodies, trees, etc. The softer materials, papers, cartons, ashes, etc., are dumped where they can be covered as fast as possible. A bulldozer is kept working at all hours during which the dump ground is open— approximately fifteen hours a day, depending on the number of daylight hours available, including Saturdays and Sundays. It is worked continuously in two shifts. The caretaker also acts as watchman, opening and closing the gates at the beginning and end of the day, and closing the gates in periods of high wind, with signs posted accordingly. Some fires inevitably start, mainly through the dumping of hot ashes. This is constantly controlled by the dirt fill. Additional equipment, consisting of draglines, shovel and equipment and an additional bulldozer have from time to time been rented and used. Eight hundred feet of 4½-foot drift fence with 7-foot posts (to permit of higher construction if necessary) was constructed along the easterly or leeward side of the dump ground for the purpose of collecting any material that would be blown in the direction of plaintiff's property. Roads were blocked off to prevent dumping in unauthorized areas. The city's witnesses testified that the improvements that had been made were such that there was no comparison with the former operation. Appellant contends that all of this is irrelevant, and simply means that despite the fact that the city was

trying hard to correct the situation, the record still compelled the conclusion that the dump as operated still constituted a nuisance. By reason of the pleadings, the period of the events recited by plaintiff and her witnesses was necessarily confined to the time between May 15, 1953 and October 1, 1953. She testified that her first case ended in February, 1952, that she waited one year to give the city a chance to clean up the situation, that by May, 1953 the conditions were still as bad if not worse, that she complained to the city manager's office and on May 21 took a number of photographs, that on that day the city manager sent out fifteen or sixteen prisoners who cleaned up all around the place, that on June 8, 1953 the condition was bad again and prisoners were sent out all week picking up papers, that on July 13, 1953 a big fire started on the dump and cinders and half-burned papers were blowing all over the property, and plaintiff got her hoses ready, that at eight o'clock that night the city had a blade working at the dump but could not control the fire, that on July 21 she filed her claim. Events and conditions testified to by her in December, 1953 and January, 1954 were without the period involved in the action and need not be discussed. She testified that the fence promised by the city manager was never built, that they built "little fences" that did not confine the material. "I don't believe a fence a hundred feet high would keep it fenced when the wind blows." She said that the smoke would blow across their property all the time, that there were small fires continuously, that they choked on the smoke, that the smell was horrible, that one could hardly breathe, that their place would be surrounded by smoke, that on one occasion the smoke was so bad that she and her husband and her child had to leave their property. Her testimony was given from a diary kept at the time. Photographs showing papers, cartons and tumbleweeds blown up against her fence were introduced in evidence. Two of her neighbors corroborated her testimony, though neither of them had made any claim against the city.

If the jury was compelled to accept in its entirety the

testimony on behalf of the plaintiff, it would certainly appear that a nuisance did in fact exist. We recently noted however in Fick v. Parman, 71 Nev. ......, 284 P.2d 380 (petition for rehearing denied): "[T]he fact that [plaintiff's witnesses] were the only eye witnesses does not compel acceptance of their testimony. Other testimony gives rise to the inference" that the facts were other than as stated by these eye witnesses. Quite clearly the jury chose to discount the testimony of these witnesses substantially. Their testimony was not of such a character that it could categorically be denied by the city and therefore any failure on the part of the city so to deny this testimony can hardly be held to constitute an admission. The city did about the only thing it could do to dispute this testimony and that was to present evidence of the manner in which the dump was being conducted. Such testimony produced the logical inference that the testimony of plaintiff's witnesses was grossly exaggerated and that there was much doubt as to the probability that the injury was as great as it was claimed to be. Plaintiff's photographs in evidence however cannot be disputed and they do show a substantial accumulation of trash along plaintiff's fence. This, however, was not shown to be a constant condition and it would appear that the photographs were taken on occasions when an accumulation of trash had resulted over a considerable period of time. In almost all instances work crews from the city cleaned up the premises. To this must be added the jury's right to consider the probability that the trash had escaped from possibly other sources (and possibly to some extent from the dump itself) as a result of high winds beyond the control of the city. As noted, plaintiff thought that even a hundred-foot fence would not control the trash in periods of high wind. She testified to one wind that blew her fence down and part of her roof off. "We have whirlwinds constantly that pick [the waste material] up and toss it, blow it over." Two inferences might well have been drawn by the jury—first that such winds might have

deposited on plaintiff's premises materials from the rubbish-laden premises adjoining her on the north, even though ordinarily she would not lie to leeward of such premises; and secondly, that if trash were deposited on her premises by whirlwinds, many residences in the Reno-Sparks area suffered likewise.

It is evident that the maintenance of the dump by the city may not be characterized as a nuisance per se. McQuillin, Municipal Corporations, sec. 54.207, 66 C.J.S. 802, Nuisances, sec. 49. It is conceded that, except in the rare cases in which something may be characterized as a nuisance as a matter of law, the determination of whether the particular operation constitutes a nuisance remains a question of fact. It was therefore within the province of the jury to determine whether the line had been crossed which would distinguish between simple annoyance, inconvenience or discomfort and actual nuisance. This distinction has been continuously recognized by the courts. Appellant minimizes this distinction, contending that her injury, however slight, would entitle her at least to nominal damages even though the jury might be loath to recommend abatement or the court to order abatement. In this she relies strongly on Wilson v. City of Portland, 153 Or. 679, 58 P.2d 257, 259, as stating the law applicable to facts similar to those here. After observing that it was not claimed that the fumes and odors from the dump caused sickness or objective physical injury, the court there said: "However, we think a person is entitled to enjoy the comforts and pleasures of his home without being compelled in this modern age to breathe foul fumes and odors coming from an unsanitary fill. Notwithstanding there was no sickness or expense incurred for medical services, we think plaintiffs have shown at least a nominal damage." This language was used in sustaining the action of the trial court denying a motion of the defendant for judgment on the pleadings. However, the court said: "The special injury to afford a basis for damages, other than

nominal damages, must be of a substantial character. We do not intend to hold that the city can be held liable in damages for every slight inconvenience or discomfort resulting from a nuisance causing obnoxious odors or fumes."

This is a situation well recognized in many cases and is entirely logical and understandable. In a very recent case the same court, while announcing that it would not relax the rule of Wilson v. City of Portland, refused, under the circumstances of the case, to hold that the dumping of raw sewage into a slough was a nuisance resulting in recoverable damage, although the case was decided mainly upon an estoppel. East St. Johns Shingle Co. v. City of Portland, 195 Or. 505, 246 P.2d 554. The same court in the recent case of Amphitheaters, Inc. v. Portland Meadows, 184 Or. 336, 198 P.2d 847, 852, 5 A.L.R.2d 690, recognizing that the existence of a nuisance is generally a question of fact, observed that it is established law that an intentional interference with the use and enjoyment of land "is not actionable unless that interference be both substantial and unreasonable," citing Restatement of the Law of Torts, Vol. 4, sec. 822, comment g and sec. 826, comment a. The opinion, written by Mr. Justice Brand, also cites Salmond on the Law of Torts, 9th Ed., 238, to the effect that interference with property or personal comforts "must be substantial." And many cases are cited which consider the question as to whether a particular annoyance or inconvenience is sufficient to constitute a nuisance. The court approved the language used in Shepler v. Kansas Milling Co., 128 Kan. 554, 278 P. 757, that: "The law does not in every instance provide directly for compensation or financial redress for every damnum a man may sustain as a member of an organized community." In the particular case interference with the full enjoyment of darkness by a lighted park was held not to be sufficient to reverse a directed verdict for the defendant by the trial court. In an early case this court defined a

nuisance and confined it to such unreasonable, unwarrantable or unlawful use by a person of his own property, or his improper, indecent or unlawful conduct which operates as an obstruction or injury to the right of another or to the public and produces such *material* annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage. Bliss v. Grayson, 24 Nev. 422, 454, 56 P. 231.

For the instruction of the jury the court defined a nuisance as "anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." It further instructed the jury that if it found that the defendant was maintaining a nuisance in the operation of the dump, to determine, as only advisory to the court, whether it should be abated, and, if damage had been caused, then to determine the amount of the damage. It further instructed the jury, without objection from the plaintiff: "If you find that the defendant has not been maintaining a nuisance in the operation of the city dumping ground, you will return a verdict to that effect and you need not decide any of the other issues." No error is assigned by reason of this instruction. Under the theory of both parties, if the jury found that the maintenance of the dump was not a nuisance, that was the end of the matter.

The plaintiff, the plaintiff's husband and two of plaintiff's neighbors all testified that the conditions during the period embraced in plaintiff's complaint, which was the period during which the earth-fill method was used, with restricted dumping, constant patrolling of the area, covering of the refuse, etc., were no better than they were when the dump and burn method was used. It is evident that the jury disbelieved this testimony and that they believed that the extravagant statements made by plaintiff and her witnesses justified them in discounting the probative effect of the photographs. Whether they considered that the photographs indicated

only isolated instances or that the damage shown was not material or that the whirlwinds brought the waste material from other sources or that they themselves were the victims of many whirlwinds during the season, we can only conjecture. Nor should we overlook the fact that the learned trial judge heard and observed the same witnesses and felt that it was within the jury's province to determine the factual issue of the existence of a nuisance and refused to interfere.

In the last analysis we feel that the jury's finding that the operation of the dump by the city did not constitute a nuisance amounted to a finding that although the plaintiff may have suffered some inconvenience, annoyance or discomfort by reason thereof, it was not so material as to constitute a nuisance. We are of the opinion that the record did not compel a finding of nuisance, but that on the contrary there was substantial evidence to support the finding that the maintenance of the dump was not a nuisance.

The judgment and the order denying the plaintiff's motion to vacate the same are affirmed with costs.

MERRILL, C. J., and EATHER, J., concur.