PETE S. PAGNI AND MILLICENT PAGNI, HUS-BAND AND WIFE, APPELLANTS, v. CITY OF SPARKS, NEVADA, A MUNICIPAL CORPORATION, AND LELAND MASINI, A. RIPARBELLI AND ELIO MARTINI, RESPONDENTS.

No. 3870

February 6, 1956.                    293 P.2d 421.

C. Lester Zahniser, of Sparks, and Martin J. Scanlan, of Reno, for Appellants.

*Leslie B. Gray,* of Reno, *John G. Spann,* of Sparks, and *John Gabrielli,* City Attorney of Sparks, for Respondents.

## OPINION

By the Court, BADT, J.:

The main question raised by this appeal is whether the trial court abused its discretion in vacating the jury's verdict for the plaintiffs and granting the defendants a new trial.

This is the third appeal recently reaching this court in which damages have been sought by reason of alleged negligence of the municipal defendant and its contract garbage haulers in the operation of its trash and garbage dump, it being asserted in each case that the dump

was so operated as to constitute a nuisance with resulting damage to the respective plaintiffs. In City of Reno v. Fields, 69 Nev. 300, 250 P.2d 140, a jury returned a verdict of $1,000 damages for the plaintiffs, the defendant city appealed and we affirmed the judgment entered upon the verdict. In Jezowski (formerly Mrs. Fields, the plaintiff in the earlier action) v. City of Reno, 71 Nev. 233, 286 P.2d 257, the jury returned a verdict for the defendant, the plaintiffs appealed and we again affirmed. In the present case the jury returned a verdict of $1 general damage and $1,152 special damages, and the trial court granted defendants' motion for new trial. This appeal is from that order. The function of this court on such an appeal is well recognized in this state. In Arrowhead Freight Lines v. White, 71 Nev. 257, 287 P.2d 718, a jury's verdict in favor of defendants was vacated, a new trial ordered upon the grounds of insufficiency of the evidence etc. and the plaintiff appealed. We said there: "The law of Nevada regarding such an appeal is well digested in Nevada Rock & Sand Company v. Grich, 59 Nev. 345, 365, 93 P.2d, 513, 521. The question is not whether we, as an appellate court, on the record before us would have reversed the jury's verdict as without evidentiary support. The question, rather, is whether upon that record the trial court can be said to have abused its discretion in granting new trial. As stated in Treadway v. Wilder, 9 Nev. 67, 70, 'It must be borne in mind that the nisi prius courts in reviewing the verdict of juries are not subject to the rules that govern appellate courts. They may weigh the evidence and if they think injustice has been done grant a new trial where appellate courts should not or could not interfere.' We must, then, respect not the jury's verdict but the trial court's judgment (that the evidence clearly preponderates against the verdict or that it would result in injustice) unless that judgment is clearly wrong." This in turn was followed in the recent case of Aeroville Corporation v. Lincoln County Power District, 71 Nev. 320, 290 P.2d 970.

It is true that the grounds for defendants' motion for new trial were stated to be the jury's manifest disregard of the instructions, excessive damages, insufficiency of the evidence, that the verdict and judgment were against law and errors in law occurring at the trial, and it is likewise true that the trial court simply entered its order granting a new trial without stating any of the reasons for such order. Appellants assert that under the requirements of sec. 8877, N.C.L. 1929, it was error for the court to fail to state in writing the grounds upon which it granted the new trial. In the amended section 9385.53, N.C.L. 1931–41 Supp., the mandatory language was changed to permissive language with reference to stating the reasons for the order. The matter in any event is now governed by Rule 59, N.R.C.P., which omits the requirement entirely.

We turn then to the evidence to ascertain whether the new trial order finds support under the rules enunciated above. Did the trial court abuse its discretion in granting a new trial? Was the judgment of the trial court in granting a new trial clearly wrong—in holding (as we must presume it did) that the evidence clearly preponderated against the verdict, or that it would result in injustice?

Our conclusion is that the order finds ample support.

Plaintiffs and their witnesses testified to the constant escape of papers, cartons, debris, trash and tin cans from both the dump used by the city's contract haulers and the dump to which private individuals were permitted to haul. These are referred to, respectively, in the evidence and marked upon the map as the existing city dump area and the public dumping area. Plaintiffs introduced in evidence a great number of photographs showing cartons, papers, tin cans etc. upon their land, against their fences and in their irrigating ditches, and there was evidence that some of this material was seen

blowing in the direction of plaintiffs' land from the dumps. Plaintiffs claim that this would not occur if the refuse were promptly burned. They also asserted that hogs were permitted to run about the dump and that they trespassed upon plaintiffs' lands and that plaintiffs were compelled on occasions to drive them out. While they asserted that smoke and odors were blown upon their lands from the dump, they did not claim this as an item of damage. The main special damages claimed by plaintiffs were the necessary expenditure of about an hour a day over a long period of time which made up, on the basis of $1 per hour, the special damages found by the jury in the sum of $1,152.

Defendants' witnesses[1] included the present mayor of Sparks (who had held office as mayor and as councilman for over 20 years), a former mayor (who had served 10 years as mayor, eight years as councilman and four years as chairman of the local school board), a former mayor (who had served as such for four years), the city engineer (who had served as such officer for some 13 years), the city building and sanitary inspector, the caterpillar and bulldozer operator who operated his equipment at the dumps, neighbors of the plaintiffs, and the present franchise haulers and their predecessors. Virtually all of these witnesses were long-time residents of Sparks, and their qualifications were for the most part either admitted or duly established. On the motion for new trial the learned trial judge was entitled to accord credence to their testimony. From such testimony and from testimony elicited from the plaintiffs' witnesses on cross examination and from other evidence in the case, the trial judge was entitled to picture the situation as follows:

The city's dump ground area, acquired from the United States in 1904 comprised a 40-acre tract about three and a half miles east of the city. Plaintiffs' lands,

---

[1]Some of these witnesses were first called by plaintiffs as adverse witnesses, or as witnesses on their behalf.

adjoining this tract on the north and east, were acquired in 1943 and later. Other parcels adjacent to the plaintiffs' land and to the city's land are owned by other persons. The city first established and used a dump ground in the northerly half of its 40-acre tract, but this was on high ground and subject to the action of the winds, which normally were south and west winds. The subject of the operation of the dump ground, in the rapid growth of the city, was a continuing problem confronting every mayor and board of councilmen. It was eventually met by providing for the issuance of an exclusive franchise, for a consideration, for the hauling of trash and garbage from the premises of the inhabitants of the city, for which the licensees collected varying fees directly from such inhabitants. The personal defendants, respondents herein, are the current licensees. The present and past licensees had numerous conferences with the city councilmen (as did likewise the plaintiff Pagni) looking toward improvement of the operation. Some old trash piles about on the easterly line of the city's parcel and encroaching on plaintiffs' land[2] were bulldozed west and upon the city's parcel, and a dividing line fence constructed. The old dump ground was abandoned and two exclusive dumping areas established, a public dumping area some 600 feet long in the easterly half of the area, and the city dump area in the westerly half, some 800 feet long. New roads were built to these areas and times and places for dumping established and policed. Fences were built and gates installed. Dumping was restricted to daylight hours. Signs were posted. The gates were closed and locked in periods of very high winds. The barbed-wire fences served to keep plaintiffs' cattle from straying upon the dump, and the mesh-wire fences to a large extent served to prevent papers and trash from blowing away. The new dump location, the consequent dumping into a canyon, the establishment of ramps for the dumping, all reduced

[2]These were for the most part ancient dumps including old tree stumps. Plaintiffs claimed no damage on this item.

to a minimum the blowing away of papers and trash. The present licensees purchased a new load packer truck, which was leak proof and prevented the escape of trash or garbage, for $12,500. As against the suggestion for adoption of a "trench and fill" method, it appeared that the entire terrain was very rocky, with very little top soil, and the adoption of such method was virtually impossible. Installation of an incinerator would have cost about a million dollars, beyond the city's financial ability to meet, and would not necessarily be a complete solution. The present operation included employment by the licensees of an operator with a bulldozer, which kept the ramps level and pushed the refuse into the canyon. Not only was the refuse burned daily— each truckload was burned immediately after it was dumped.[3] However, unlawful dumping continued to be made along the roads, and papers and refuse would blow from these unlawful dumps toward plaintiffs' property. The city made constant efforts to stop such unlawful dumping. As against some 45 photographs introduced by plaintiffs showing papers and refuse upon their lands, in their ditches and against their fences, defendants: (1) introduced some 16 photographs showing the premises and approaches to be quite clean; (2) pointed out that most of the refuse shown in plaintiffs' photographs comprised (a) tumbleweeds, which plaintiffs conceded blew in from everywhere, (b) garbage cans and other tin cans which were never seen to fly through the air on the wind, and (c) papers and cartons in small quantities; and (3) introduced the testimony of two witnesses that the licensees had offered to plaintiff Pagni to remove any existing papers and trash from his premises, build a woven-wire fence along the south

---

[3] Pagni had testified on direct examination both to the annoyance he suffered from smoke from the dump and also that the trash was not burned daily. On cross examination he was asked: "Do you complain about the burning, or do you want them to burn, which do you prefer?" He answered, "I am not complaining about the burning. I'm complaining about the trash * * * If they burned it right away, it wouldn't have come over."

line of one of his parcels, and thus afford an accurate check of any future escaping refuse; that Pagni rejected this offer because he would have the burden of maintaining the fence and because he did not want people on his land. The state health department found the dump operation to be satisfactory and had never made any recommendation for any change in method.

Much of the foregoing testimony was denied by the plaintiffs. In addition to that testimony, however, there was much before the court which we do not find in the record. This grows out of the fact that, despite the constant admonitions of the learned trial judge, many matters were called to the attention of the court and the jury which are entirely unintelligible to this court in reading the record. The situation differs only in degree from one in which there is no record to support a claim that the evidence does not sustain a verdict or a finding of the court. The record is replete on page after page with testimony of a witness who testifies that, "This ditch is over here," or "The high ground is over there," or "The road comes up from this direction," or "This is the field that I examined," or "I didn't go into that field over there." All this was with reference to a map used to illustrate and explain the testimony of most of the witnesses in the case, and which may have presented to the trial judge additional reasons in support of his new trial order.[4]

We think that it is clearly demonstrated that there was no abuse of discretion in the order appealed from, and it is affirmed with costs.

MERRILL, C. J., and EATHER, J., concur.

---

[4] We cannot refrain from quoting one answer: "There is a hill here. This is on the easterly-northeasterly slope of that hill, and this here, of course, is also behind the hill, but across the ravine * * *. It is behind this hill here. Now, whether this hill here could afford the protection when it's that far away or not * * *."